**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 1 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SHARON M. DETERS, also known as
Sharon M. Anderson,

     Plaintiff - Appellee,

vs.

EQUIFAX CREDIT INFORMATION
SERVICES, INC.,

     Defendant - Appellant.

No. 97-3340

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 96-2212-JWL)
981 F. Supp. 1381

---

Scott A. McCreight, (and Korey A. Kaul, Sprenger & McCreight, L.C., Kansas
City, Missouri, and Michael S. Ketchmark and Joseph K. Eischens, Davis,
Ketchmark & Eischens, Kansas City, Missouri, with him on the brief), for
Plaintiff-Appellee.

Michaela M. Warden (and Jack L. Whitacre and William C. Martucci, Spencer,
Fane, Britt & Browne, L.L.P., Overland Park, Kansas, with her on the brief), for
Defendant-Appellant.

---

Before BALDOCK, EBEL, and KELLY, Circuit Judges.

---

KELLY, Circuit Judge.

Defendant-Appellant, Equifax Credit Information Services, Inc.

("Equifax"), appeals from a $300,000 judgment entered on a jury verdict in favor

of Plaintiff-Appellee, Sharon Deters ("Ms. Deters"), on her sexual harassment

claim. The jury awarded Ms. Deters $5,000 in compensatory damages, and

$1,000,000 in punitive damages, later reduced by the court to $295,000 based on

the cap established by 42 U.S.C. § 1981a(b)(3). The district court denied

Equifax's post-trial motion for judgment as a matter of law, or alternatively for a

new trial or remittitur. See Deters v. Equifax Credit Information Servs., 981 F.

Supp. 1381, 1384 (D. Kan. 1997). On appeal, Equifax contends that (1) the

evidence is insufficient to support punitive damages based upon a supervisor's

alleged failure to investigate and take prompt corrective action to stop the

harassment; (2) it is not responsible for the conduct of its supervisor either

because it had no knowledge of that conduct or the supervisor was not a policy

maker and was acting in accordance with corporate policy, (3) the district court

erred in denying its post-trial motion for a new trial or remittitur, and (4) the

district court erred in admitting a videotape recounting sexual harassment, thereby

depriving it of a fair trial. Our jurisdiction arises under 28 U.S.C. § 1291 and we

affirm.

Background

Ms. Deters worked in the administration department of Equifax in the Lenexa, Kansas office. That office is engaged in the debt collection business. Debt collectors were supervised by assistant department managers (ADMs) and both were considered the "revenue producers." Ms. Deters presented evidence at trial that during her tenure at Equifax, from August 1994 to October 1995, she was repeatedly subject to sexual harassment, which she perceived as abusive, by three male co-workers, and her original male supervisor.

I.    The Harassment

Ms. Deters testified that one of her daily functions was to supply numbers to the ADMs on the collection floor, on which their bonuses were based. When one ADM (first ADM) did not like the numbers he saw, he twisted her arm and made her recalculate them. If she would not recalculate them or walked away, the ADM would yell "hey you F'ing B, get back here" or "come here you C."[1]    Aplt. App. 397, 410. This was a daily occurrence. See id. at 398, 470. This ADM also told crude sexually-oriented jokes. According to Ms. Deters, another ADM (second ADM) began the same type of activities directed toward her after the first ADM started. See id. at 414-15; 529-33. She testified that both men leered at her

---

[1] Repeated use of such epithets in the workplace can contribute to a finding of sexual harassment. See Winsor v. Hinckley Dodge, Inc., 79 F.3d 996, 1000 (10th Cir. 1996).

as she walked through the entire office handing out numbers to the ADMs. See id. at 415.

The first ADM frequently talked about sexual acts and breasts. When he told another female employee "that she had perky tits that looked right at him," Ms. Deters stared at him in shock only to be told "'what are you looking at, you F'ing B.'" Id. at 401. This ADM also grabbed Ms. Deters' arm, telling her "'my you're a frail thing . . . if I was ever to have sex with you, I'd crush you like grapes." Id. at 406. Ms. Deters complained about the first ADM and the second ADM. See id. at 401, 407, 531. She took her complaints to Jim Taylor, the general manager of the Lenexa office. Ms. Deters also complained when she overheard these ADMs discussing having sex with her. The first ADM made a bet with her original supervisor about "who [was going] to sleep with her first." Id. at 401-04, 433. The original supervisor claimed to have won the bet. See id. at 404, 432.

Ms. Deters also testified that her original supervisor frequently called her at home "at any hour of the night and he'd want to talk," making it very clear that he wanted to go out with her, even though she told him she was engaged and not interested. Id. at 425-27. Ms. Deters complained to Mr. Taylor. See id. at 431. According to Ms. Deters, when she unexpectedly needed two days off, her original supervisor told her job was at risk and that she needed to meet him at a

- 4 -

restaurant to discuss it. See id. at 428. No business was discussed, Ms. Deters testified that she drove him home because he was intoxicated; when she was leaving, he grabbed her and kissed her. See id. at 430. Ms. Deters complained to Mr. Taylor again, but to no avail. Her original supervisor later stared at her chest and asked if she wanted to take off her jacket. See id. at 432.

Ms. Deters also testified that that she also had problems with a male collector because he would touch her or grab her hand and tell her "I love redheads." Id. at 433. She viewed his conduct as "very aggressive," despite her saying "no," or "I'm busy" or walking away, the collector followed her or approached her again. Id. at 434. The collector frequently asked Ms. Deters' to see him play in a band; squeezing her arm or hands in a suggestive manner; she would pull away and refuse. See id. at 435. She complained to Mr. Taylor telling him that the collector's actions made her "very uncomfortable and that he (the collector) wouldn't let it be. That he was just being persistent and persistent and persistent." Id. at 435. She also complained when the collector came into her office, sat next to her, pushed her skirt up and begin rubbing her leg before she fought him off. Id. at 493.

II.    The Response

Just as the record is replete with testimony of co-workers corroborating Ms. Deters version of the harassment, so too is it with testimony that she routinely

complained to Mr. Taylor, who indicated that he would take care of it. Mr. Taylor was the highest managerial officer in the Kansas City office, overseeing the entire staff, with the power to hire, fire, approve salaries, and discipline individuals in the office. He was designated specifically by Equifax to implement its human resources policies, which included the sexual harassment policy. Ms. Deters presented evidence at trial that entitled the jury to believe that (1) Mr. Taylor had personal knowledge of the harassment occurring including the epithets, see id. at 471, and (2) Mr. Taylor's responses to her persistent complaints were seriously deficient. Ms. Deters testified that Mr. Taylor:

> told me . . . that these were revenue producers. These were people producing revenue for the company. That I needed to remember that I was a non-revenue person or that I was in a non-revenue producing department.

Id. at 412. She further testified that the harassing conduct was explained to her as a by-product of the "hard core" and "rough around the edges" personality type necessary to be a collector, and that she had to tolerate the name calling and the language. Id. at 413, 473-74. In response to the groping incident, she was told "that [the collector] was friendly, that [she was] reading too much into it." Id. at 494.

Evidence was also presented that Equifax's home office in Atlanta was aware that Ms. Deter's co-worker, Angel Pernice, was subject to sexual harassment in the same time period, by the second ADM who persistently

harassed Ms. Deters. The human resources officers in Atlanta delayed investigation of Pernice's allegations for six months, and only commenced their investigation after Ms. Deters severed her employment with Equifax.

## Discussion

We review the district court's denial Equifax's motion for judgment as a matter of law de novo, applying the same legal standard as the district court. See Baty v. Willamette Industries, Inc., 172 F.3d 1232, 1241 (10th Cir. 1999). Equifax is only entitled to judgment as a matter of law if the "'evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion.'" Id. (quoting Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1450 (10th Cir. 1997). In our review of the record, we will not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury. Id. Judgment as a matter of law in favor of Equifax is appropriate only if "'there is no legally sufficient evidentiary basis ... with respect to a claim or defense ... under the controlling law.'" Id. (quoting Harolds Stores, Inc. v. Dillard Dep't Stores, 82 F.3d 1533, 1546-47 (10th Cir. 1996) (internal quotes and citation omitted). We consider the evidence, and any inferences drawn therefrom in favor of Ms. Deters, the non-moving party. Id.

We review the district court's denial of a motion for a new trial for abuse

of discretion, reversing only if it clearly erred, or ventured beyond the limits of permissible choice.  Id.  We review the district court's denial of remittitur for "'manifest abuse of discretion'".  Id. (quoting Vining v. Enterprise Fin. Group, Inc., 148 F.3d 1206, 1216 (10th Cir. 1998).

Equifax does not argue, nor could it,  that the conduct of the ADMs, the collector and the original supervisor as portrayed by Ms. Deters is insufficient to constitute hostile work environment sexual harassment.  See Harris v. Forklift, Systems, Inc., 510 U.S. 17, 21 (1993) (requiring that the conduct be severe or pervasive enough to create an objectively hostile or abusive work environment and that the victim perceive it as such); 29 C.F.R. § 1604.11(a).  Nor does it argue that it took immediate and appropriate corrective action.  See Hirschfeld v. New Mexico Corrections Dep't, 916 F.2d 572, 577 (10th Cir. 1990); 29 C.F.R. § 1604.11(d).

III.    Evidence of "Reckless" or "Malicious" Conduct

Rather, Equifax argues, as a matter of law, that Ms. Deters is not entitled to punitive damages because Mr. Taylor was merely negligent, and there is not sufficient evidence to support a finding that his conduct was "reckless" or "malicious."  Equifax argues that Ms. Deters' testimony that she complained to Mr. Taylor regularly, describing the nature of the harassment, is not credible,  and urges us to consider its version of what Mr. Taylor knew, rather than the evidence

- 8 -

Ms. Deters' presented at trial.[2]  Equifax claims that Mr. Taylor did not know the

extent to which Ms. Deters suffered sexual harassment; he did not know the types

of sexually charged, vulgar language that co-workers used, nor was he privy to

fact that Ms. Deters was subject to further unwanted groping by a co-worker

(second ADM) whom Mr. Taylor had previously admonished for similar conduct.

Equifax asserts that Mr. Taylor merely failed to communicate effectively with his

staff.  In sum, Equifax concludes that such inadvertence, mistake, and errors of

judgment are at most simple negligence, and do not satisfy the recklessness or

malice requirement for the award of punitive damages.

Whether there is sufficient evidence to support a punitive damages award is

a question of law which we review de novo.  See Fitzgerald v. Mountain States

Tel. & Tel. Co., 68 F.3d 1257, 1262 (10th Cir. 1995).  To be eligible for punitive

damages, a complaining party must show that the respondent engaged in

discriminatory practice or practices with malice or with reckless indifference to

federally protected rights.  42 U.S.C. § 1981a(b)(1); See also Knowlton v.

Teltrust Phones, Inc., 189 F.3d 1177, 1186 (10th Cir. 1999).  "Malice" and

---

[2] Equifax also argues that the behavior of one of Ms. Deters' harassers is beyond our consideration, as it transpired more than 300 days before the filing of Ms. Deters' charges.  See 42 U.S.C. 2000e-5(e)(1).  However, Equifax fails to note that the jury found that Ms. Deters was subject to a continuing violation. Therefore, we may consider these events by virtue of the "continuing violation" exception to the limitations period.  See Hunt v. Bennett, 17 F.3d 1263, 1266 (10th Cir. 1993).

"reckless indifference" in this context refer not to the egregiousness of the employer's conduct, but rather to the employer's knowledge that it may be acting in violation of federal law. See Kolstad v. American Dental Association, 119 S.Ct. 2118, 2124 (1999). More specifically, recklessness and malice are to be inferred when a manager responsible for setting or enforcing policy in the area of discrimination does not respond to complaints, despite knowledge of serious harassment. See Baty, 172 F.3d at 1244-45.

In the instant case, Ms. Deters introduced evidence that entitled the jury to believe that she persistently complained to Mr. Taylor, describing to him in excruciating detail, the nature of the sexual harassment to which she was subjected. Moreover, she introduced evidence, including the testimony of two witnesses, that Mr. Taylor personally observed instances in which Ms. Deters was verbally abused with vulgar language, and lewd jokes and comments were made in her presence. According to this evidence, Mr. Taylor was wholly unresponsive. When Ms. Deters complained about co-workers insulting her using vulgar sexual language, Mr. Taylor responded that these men were "hardcore" and reminded Ms. Deters that they were revenue producers, and that she was not. On another occasion when Ms. Deters complained about being groped and fondled by a co-worker, Mr. Taylor responded that he was just friendly, and that she was reading too much into it. By his own testimony, Mr. Taylor stated that he knew that this

type of conduct constitutes sexual harassment. Thus, Ms. Deters presented evidence from which a reasonable jury could have inferred that management not only did not respond to her complaints, but also minimized and disregarded them so as to protect the "revenue producers" in the operation. On this evidence a jury could reasonably conclude that Equifax acted with malice or reckless indifference with respect to sexual harassment, entitling Ms. Deters to punitive damages. See Baty, 172 F.3d at 1244-45.

Equifax argues that Ms. Deters' evidence is not credible, and that we should instead consider that Mr. Taylor denied that Ms. Deters ever complained with specificity, and that he contradicted her testimony and the testimony of others that he witnessed acts of sexual harassment. However, in making this argument, Equifax ignores our standard of review. We are compelled to draw every reasonable inference in Ms. Deters' favor. See Baty, 172 F.3d at 1241. The credibility of witnesses is for the jury to evaluate, and we will not disturb its conclusion. See Thunder Basin Coal Co. v. Southwestern Public Service Co., 104 F.3d 1205, 1212 (10th Cir. 1997); see also FDIC v. Hamilton, 122 F.3d 854, 860 (10th Cir. 1997) ("We are not empowered to undertake a review of the evidence which would amount to a trial de novo"). We thus reject Equifax's argument that the evidence was insufficient to support an award of punitive damages.

IV.    Mr. Taylor's Managerial Status and Equifax's Knowledge

Equifax next argues that even if Taylor did act in a reckless and malicious fashion, liability for punitive damages may not be imputed to Equifax itself, as Mr. Taylor is not a managerial-level employee, and that his alleged non-responsiveness is contrary to Equifax's good-faith policies against sexual harassment.  Additionally, Equifax argues that it is not liable for punitive damages, as it had no notice of the misconduct Ms. Deters alleges.

We note at the outset that employer malice or reckless indifference in failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew or should have known is premised on direct liability, not derivative liability, according to the doctrine of respondeat superior.[3] See generally Adler v. Wal-Mart Stores, 144 F.3d 664, 673 (10th Cir. 1998) (discussing direct liability in the context of compensatory damages).  Thus, the district court's discussion of direct liability was neither novel nor in error, as

_____

[3] An employer is vicariously liable for a supervisor's creation of a sexually hostile work environment, but may be able to raise the affirmative defense "'that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior.'" Baty, 172 F.3d at 1242 (quoting Burlington Industries, Inc. v. Ellerth, 118 S.Ct. 2257, 2270 (1998)).  Thus, vicarious liability applies to situations in which a supervisor perpetrates harassment himself, whereas a theory of direct liability is more appropriate where an employer fails to respond adequately to harassment of which a management-level employee knew or should have known.  This distinction is subtle, but proves to be crucial to our discussion of Equifax's invocation of a "good-faith" defense.

Equifax claims. The relevant inquiry for Equifax's liability in the instant case is whether Equifax had actual or constructive knowledge of the harassment, and whether its response was adequate. Id.

In evaluating a company's liability for punitive damages, Congress has imposed a stricter standard than prevails in evaluating a company's liability for compensatory damages. In the area of liability for punitive damages we must be governed by the statutory language recently enacted by Congress in the Civil Rights Act of 1991. This statutory standard reads as follows:

> A complaining party may recover punitive damages under this section against a respondent . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1). The statute speaks in terms of an employer acting recklessly or maliciously. Thus, we are required to determine who qualifies as the employer for purposes of imposing direct punitive liability.

Here, we need not decide whether Mr. Taylor was a sufficiently highly ranked managerial or policy-making employee such that his knowledge of the harassment Ms. Deters suffered would be imputed as a matter of law to Equifax. It is sufficient here that Equifax had specifically designated Mr. Taylor as a final representative of the company to implement the sexual harassment policy in its Lenexa branch, and to process complaints of sexual harassment. Equifax's

- 13 -

policy, as published to its employees in its handbook, reads as follows:

> If you feel that you are being harassed in any way by another employee . . . you should talk to your supervisor immediately. The matter will be thoroughly investigated, and where appropriate, disciplinary action will be taken. If you do not feel that you can discuss the matter with your supervisor or if you are not satisfied with the way your complaint has been handled, <u>please contact either your human resources officer</u> or Becky Padgett, vice president–Corporate Human Resources. You will not be penalized in any way for reporting such conduct whether it involves yourself or another person.

Mr. Taylor was the human resources officer for Equifax's Lenexa branch. When a company specifically designates a particular employee within the company as a final person responsible for enforcing that company's policy against discrimination, then by the company's own designation, information provided to such an employee is knowledge to the company.

Further enhancing Equifax's knowledge of sexual harassment, occurring in its Lenexa branch is the fact that the human resources employees at the Equifax home office in Atlanta had been made aware of Ms. Pernice's allegations against a second ADM who also perpetrated harassment against Ms. Deters, similar in nature and near in time. See Hirase-Doi v. U.S. West, 61 F.3d 777, 784 (10th Cir. 1995). The second ADM was accused by Ms. Pernice of surreptitiously looking down her blouse while on a business trip in Atlanta, and then memorializing the event by discussing it with another co-worker on a videotape. Ms. Deters was being harassed during the same period, the summer of 1995, when Ms. Pernice

- 14 -

complained of harassment. Ms. Pernice made complaints both to Mr. Taylor, and to human resources employees at the Equifax home office in Atlanta, describing the contents of the videotape. Equifax vice-president William Cheeks was visiting the Lenexa office at the time Mr. Taylor received the complaint and videotape. Thus, following our reasoning in Hirase-Doi, Ms. Deters may rely on Equifax's notice of evidence of sexual harassment perpetrated against Ms. Pernice. Id.

Thus, having determined that Equifax had knowledge of the ongoing harassment suffered by Ms. Deters, we must evaluate its response. We look to the responses of Mr. Taylor to Ms. Deters' persistent complaints. See Adler, 144 F.3d at 677 (evaluating responses of management-level employees for purposes of imputing direct liability to employer). Our previous discussion of Mr. Taylor's responses amply demonstrates that Equifax's responses to Ms. Deters' complaints were not merely inadequate, but rather reckless and malicious. See supra Part III. In sum, Mr. Taylor - the manager specifically charged by Equifax with the enforcement and implementation of the sexual harassment policy at the Lenexa office - responded to Ms. Deters' numerous complaints with utter disregard of her rights, actually condoning the harassment for the sake of protecting Equifax's revenue producing employees.

Finally, Equifax argues that even assuming that Mr. Taylor was a

management-level employee for purposes of imputing punitive liability, his misconduct is not attributable to Equifax, because it goes against the company's good-faith policies against sexual harassment. It is certainly true, as the Supreme Court recently stated, that in the context of punitive damages, an employer may not be liable for the discriminatory employment decisions of management-level employees where these acts are contrary to good-faith efforts on the part of the employer to comply with Title VII. See Kolstad, 119 S. Ct. at 2129. This principle is meant to advance the purposes of Title VII by encouraging the remediation and prevention that lie at the heart of the statute's goals. Id. It would defeat these purposes to hold an employer strictly liable for the acts of rogue managers when it has made every effort to comply with Title VII's requirements. However, Kolstad was a case involving vicarious liability, unlike this case which is premised on a theory of direct liability. Thus, the good-faith defense does not apply. It is negated by a showing of direct malice or reckless indifference to federally protected rights of Ms. Deters, by Mr. Taylor who was designated by the company as a final decision-making authority responsible for implementing the company anti-discrimination policy in the Lenexa office.

V.    Excessiveness of Punitive Damages Award

Equifax next argues that even if Ms. Deters is entitled to punitive damages, the award is excessive and contrary to constitutional, common law, and statutory

criteria. Equifax thus requests a remittitur or a new trial. Equifax claims that the size of the award is excessive because, even assuming Mr. Taylor had notice requiring further investigation, the sexual harassment involved was minor and innocuous, not involving any unwanted touching, egregious or blatant kidding or chiding or embarrassing sexual references in the workplace. Thus, it was impossible for Equifax to be on notice that it would be exposed to a punitive award of this magnitude. Equifax concedes that if punitive damages are permissible in this case, under the facts as it renders them, an award of $50,000 would be appropriate. Equifax also argues that the ratio of punitive damages to compensatory damages is excessively disproportionate. Equifax finally argues that because the conduct in question was not egregious, the district court should have further reduced the punitive award below the amount remaining under the statutory cap, after compensatory damages were calculated.

The Supreme Court has articulated the standard for constitutionally excessive punitive damages awards. See BMW of North America v. Gore, 116 S.Ct. 1589, 1595 (1996); see also Continental Trend Resources Inc. v. OXY USA Inc., 101 F.3d 634, 636 (10th Cir. 1996). One must receive fair notice both that certain conduct will subject him to punishment, and the possible severity of the punishment that may be imposed. See Continental Trend, 101 F.3d at 636 (quoting BMW, 116 S.Ct. at 1598). There are three "guideposts" involved in this

fair notice calculus.  See id.  First, and most important, is the reprehensibility of defendant's conduct.  See id.  Second, is the ratio of the punitive damages awarded to the actual harm inflicted on the plaintiff.  See id.  The third guidepost is a comparison of the punitive damages award with "'the civil or criminal penalties that could be imposed for comparable misconduct.'" Id. (quoting BMW, 116 S.Ct. at 1603).  Additionally, in analyzing a punitive damages award for excessiveness, we must consider the goal of deterrence.  Id. at 641 (citing BMW, 116 S.Ct. at 1603).  The size and wealth of the defendant are relevant factors in this regard.  Id.

Applying this analysis to the instant case, we are unpersuaded by Equifax's arguments.  Equifax certainly had notice that it could be subject to punitive damages for involvement in discriminatory practices with malice or with reckless indifference to an individual's federally protected rights, by virtue of the plain language of Title VII itself.  See 42 U.S.C. § 1981a(b)(1); see also Baty, 172 F.3d at 1244 (holding that the provision for punitive damages in the statute itself constitute notice.).  Equifax argues that it could not have anticipated that it would be exposed to the statutory maximum for damages, given what occurred here.  However, Equifax's argument relies on our accepting its rendering of the facts, rather than following our standard of review, reviewing the facts in the light most favorable to the prevailing party.  See Anaeme v. Diagnostek, Inc., 164 F.3d

1275, 1284 (10th Cir. 1999). Evidence was presented to the jury that Equifax had repeated notice of severe and pervasive sexual harassment. Instead of taking immediate appropriate and corrective action reasonably calculated to end the harassment, Mr. Taylor offered Ms. Deters legally indefensible reasons why the harassment should be overlooked, i.e. the ADMs and the collectors were revenue producers and she was not; the ADMs were "hard core" and such an attitude was necessary to a successful collector. Though its responses were wanting, it is evident that Equifax had fair notice that it could be exposed to the statutory maximum for damages under 42 U.S.C. 1981a(b)(3).

Equifax argues that the award should be reduced because the ratio of compensatory to punitive damages is wholly disproportionate. Equifax claims that under controlling precedents, a punitive damages ratio of 6:1 is the maximum constitutionally permissible. However, Equifax misconstrues the relevant precedent. Both BMW and Continental Trend noted that these firm ratios are most applicable to purely economic injury cases where injury is not hard to detect. See Continental Trend, 101 F.3d at 639. Moreover, both the Supreme Court and this court acknowledge that low awards of compensatory damages may support a higher ratio if a particularly egregious act has resulted in a small amount of economic damages. See id. (citing BMW, 116 S.Ct. at 1602). Additionally, as in cases such as Ms. Deters', where the injury is primarily personal, a greater ratio

may be appropriate. Id. at 638. In fact, the Seventh Circuit has held that punitive damages are available for sexual harassment under Title VII, even in the total absence of compensatory damages. See Timm v. Progressive Steel Treating, Inc., 137 F.3d 1008, 1010 (7th Cir. 1998). Despite Equifax's arguments to the contrary, the jury certainly could have perceived Equifax's lack of an effective response as recklessly indifferent. We are not persuaded that the ratio between compensatory and punitive damages in the instant case is unconstitutionally disproportionate. Thus, the district court's refusal to further reduce the punitive damages was not an abuse of discretion.

In assessing the reasonableness of the punitive damages award in the instant case, we must consider the purposes of such a remedy, namely to punish and deter. See BMW, 116 S.Ct. at 1595. In this respect, the wealth and size of the defendant are relevant considerations. See Continental Trend, 101 F.3d at 641. We agree with the district court that Equifax's gross operating revenue of $1.8 billion in 1996 could be considered in levying a substantial punitive damages award.

Finally, Equifax argues that the district court should have reduced the punitive damages award below the remainder left under the cap provided by 1981a(b)(3), because the statutory maximum should be reserved for the most severe misconduct. See Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d

1344, 1355 (7th Cir. 1995). The Second Circuit's reasoning in <u>Luciano v. The</u>

<u>Olsten Corp.</u>, 110 F.3d 210 (2nd Cir. 1997), relied upon by the district court, is

persuasive. Section 1981a establishes a regime whereby the jury will set the

damages, without reference to the statutory cap. Then, if the damages awarded

exceed the relevant limit, the district court shall reduce the amount so that it

conforms to the statutory cap. The statutory cap is not the limit of a damages

spectrum, within which the judge might recalibrate the award given by the jury.

See <u>Luciano</u>, 110 F.3d at 221 (citing H.R. Rep. No. 40(I), 102d Cong., 1st Sess.

72 (1991), reprinted in, 1991 U.S.C.C.A.N. 610). To treat it as such would be to

invade the province of the jury, something explicitly contrary to the purposes of

1981a. <u>See id</u>. Thus, only when an award would "'shock the judicial conscience,

and constitute a denial of justice,' for example because it would 'result in the

financial ruin of the defendant' or 'constitute a disproportionately large

percentage of a defendant's net worth,'" will we reduce the award below the

statutory cap. See <u>id.</u> (quoting <u>Vasbinder v. Scott</u>, 976 F.2d 118, 121 (2nd Cir.

1992)); <u>see also</u> <u>Baty</u>, 172 F.3d at 1245. Given the facts of this case, the punitive

award, being the remainder left under the statutory cap, does not shock the

conscience. Thus, we hold that the district court did not abuse its discretion in

reducing the punitive award to conform with the limits established by 1981a.

VI.     Admission of the Video Tape

Equifax argues that the district court erroneously admitted a videotape of the second ADM describing how he leered at Ms. Pernice's breasts and body during a cab ride on an out-of-town business trip. Equifax argues that the district court wrongly admitted the videotape under the theory that it was evidence of notice to Equifax in Ms. Deters' case. Equifax argues that this tape could not constitute notice because the harassment on the tape was different in kind from that alleged by Ms. Deters. Moreover, Equifax argues that the videotape was irrelevant, because the Atlanta office of Equifax only received a recitation of the tape's contents. Finally, Equifax argues that the videotape was unfairly prejudicial and inflamed the jury against Equifax.

As stated previously, Ms. Deters is entitled to rely on Equifax's notice of any evidence of sexual harassment by a perpetrator that is similar in nature and near in time to his harassment of Ms. Deters for purposes of imputing liability. See generally Hirase-Doi, 61 F.3d at 784. Ms. Deters presented evidence that entitled the jury to believe that the second ADM on the Pernice videotape also harassed her in a similar manner. The events involving Ms. Deters corresponded in time with the rendition of events captured on videotape. Moreover, Mr. Taylor and possibly Mr. Cheeks personally viewed the videotape. Thus, the district court properly admitted the videotape into evidence to show that Equifax was on notice

that Ms. Deters was being sexually harassed.

Equifax's argument that the admission of the videotape was unfairly prejudicial is likewise without merit. Evidence should be excluded under Rule 403 only if the probative value of the evidence is substantially outweighed by unfair prejudice. See Securities and Exchange Commission v. Peters, 978 F.2d 1162, 1171 (10th Cir. 1992). In performing the 403 balancing, the court should "'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.'" Id. (quoting 1 J. Weinstein & M. Burger, Weinstein's Evidence ¶ 403 [3], at 403-25 to 403-26 (1982). The district court is clearly in a superior position to perform this analysis, and thus is accorded broad discretion in making such decisions. Id. Reversal is not warranted absent a showing of clear abuse of discretion. Id. We find no such abuse in the instant case. The videotape was probative of Equifax's knowledge, for the reasons given above, and resulted in no unfair prejudice to Equifax. As has been stated many times, Rule 403 does not protect a party from all prejudice, only unfair prejudice. The videotape was properly admitted, and the district court did not abuse its discretion.

AFFIRMED. Equifax's motion to include an item in the record pursuant to 10th Cir. R. 10.3.3 is GRANTED and Equifax's letter request for permission to provide additional transcript citations in response to oral argument is GRANTED.