Joseph P. **MILLAZZO,** Cynthia
A. Nault and David R.
Vine, Plaintiffs,

v.

**UNIVERSAL TRAFFIC SERVICE,
INC., a Michigan corporation,
Defendant.**

No. CIV.01–B–880 OES.

United States District Court,
D. Colorado.

Oct. 28, 2003.

Angela L. Ekker, Barnhart, Ekker & McNally, LLP, Englewood, CO, for Plaintiffs.

Dolores S. Atencio, Maria Theresa Antill, Atencio Law Firm, LLC, Denver, CO, Gary A. Chamberlin, Miller, Johnson, Snell & Cummiskey, Grand Rapids, MI, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiffs Joseph Millazzo, Cynthia Nault, and David Vine brought remaining claims under Title VII for failure to adhere to religious beliefs, failure to accommodate, and hostile work environment against Defendant Universal Traffic Service ("UTS"). After a nine-day jury trial the jury found in favor of UTS as to Plaintiff Millazzo; in favor of Plaintiff Nault as to her hostile work environment claim only; and in favor of Plaintiff Vine as to all three Title VII claims. The jury awarded Ms. Nault $5,000 in compensatory damages and $375,000 in punitive damages. It awarded Mr. Vine $15,000 in compensatory damages and $375,000 in punitive damages. UTS moves for *remittitur* of the jury's award and to apply the statutory cap. The issues have been briefed and argued. For the reasons set forth below, I grant UTS's motion with respect to application of the statutory cap and deny the motion with respect to its request for *remittitur*.

## I. Facts

UTS, headquartered in Grand Rapids, Michigan, is a service provider in the freight transportation management industry. UTS brokers shipping, receiving and other logistic services related to transporting goods. Ray Chester is UTS's chief executive officer, president and a co-owner. Mr. Chester owns UTS with two co-owners: Ken Clark and Joe Burgess.

In 1996, UTS hired Mr. Millazzo to be General Manager of a new UTS office to be located in Denver, Colorado. As General Manager, Mr. Millazzo was responsible for opening and operating the Denver office, including the solicitation of new Denver accounts. He also managed the Denver UTS workforce. Among those Mr. Millazzo hired were Cynthia Nault and David Vine. Ms. Nault worked as a dispatch support employee and Mr. Vine as manager of operations.

Mr. Chester and Mr. Millazzo have known each other since they were ten years old and attended Catholic grammar school together. Both are openly religious. Mr. Millazzo is Catholic, while Mr. Chester describes himself as Christian. Ms. Nault is also Catholic. Mr. Vine is Lutheran. At trial, evidence showed that Mr. Chester believed in giving money to religious organizations in order to help empower individuals and UTS to succeed financially. In that vein, he openly encouraged UTS employees to give money to religious organizations he favored. Mr. Chester also sent employees audiotapes of himself speaking biblical scripture and

prayers. He expected employees to listen to those tapes and pray accordingly.

In early 1997, Mr. Chester further advanced his religious opinions at a business dinner. In a conversation between him and Ms. Nault, the two discussed the purpose of tithing. Mr. Chester contended that such practice would help the company prosper, while Ms. Nault believed that in giving one should not expect or hope for a return. During the discussion, Ms. Nault became upset and started crying. Shortly after the dinner, Ms. Nault complained about the conduct to Mr. Vine and Mr. Millazzo—her immediate supervisors in Denver.

In March 1997, at a UTS award dinner, Mr. Chester gave a speech that incorporated religious themes. He then presented a "corporate prayer" which, he contended, embodied the UTS philosophy. He "requested" that everybody present sign the prayer before leaving. Mr. Vine, who was present at the meeting, complied but later complained to Mr. Millazzo about having to sign the prayer. Because Mr. Millazzo and Ms. Nault were not present at the meeting, Mr. Chester sent a letter to Mr. Millazzo directing him and Ms. Nault to get together, say the prayer, sign it, and send it back to him.

On occasion, Mr. Chester would also send other prayers to the Denver office expecting their recitation, and send scripture to Mr. Millazzo. On March 27, 1997, Mr. Millazzo was diagnosed with colon cancer. During the next year, he underwent three different surgeries and chemotherapy to battle the illness. In response, Mr. Chester traveled to Denver. In expressing concern about Mr. Millazzo, Mr. Chester told Ms. Nault that he wished to persuade Mr. Millazzo to pray harder and forego surgery because praying would be more effective.

On another occasion, Mr. Vine wished Mr. Chester "good luck" in securing a sale.

Mr. Millazzo testified that Mr. Chester instructed him to "chew out" Mr. Vine because the comment "good luck" insinuates a lack of faith. Mr. Millazzo reluctantly carried out Mr. Chester's order.

In fall 1997, Mr. Chester forwarded a memorandum referencing his corporate mission statement which he expected the Denver employees to memorize. Mr. Chester included a "personal message" with which he intended to motivate employees to pray. In the personal statement, Mr. Chester encouraged employees to read and "meditate over" the "corporate mission statement." That statement also contained religious overtone.

After being injured in a car accident Ms. Nault feared missing work because she believed she would be fired for having a lack of faith. Mr. Vine, suffering from back pain during his tenure at UTS, also feared repercussions if he missed work. Ms. Nault and Mr. Vine complained to Mr. Millazzo about Mr. Chester's conduct. At trial, Mr. Millazzo testified that he advised Mr. Chester of these employee complaints on several occasions. Testimony indicated that Mr. Chester "just didn't care" about his employees' religious differences and that when advised that his actions were illegal he responded that UTS was his company and he could do what he wanted.

On May 15, 1999, Ms. Nault and Mr. Vine left UTS. Mr. Vine told Mr. Millazzo that he left because he could no longer endure the religious memoranda, tapes and scripture. Ms. Nault informed Mr. Millazzo that she was leaving because of religious discrimination and because of the forced prayers that were "intended to make more money for Ray Chester."

A jury trial was held on the Plaintiffs' remaining claims August 11 through August 20, 2003. The jury returned a verdict in favor UTS as to Plaintiff Millazzo's claims, in favor of Plaintiff Nault as to her

hostile work environment claim only, and in favor of Plaintiff Vine as to all three Title VII claims. The jury awarded Ms. Nault $5,000 in compensatory damages and $375,000 in punitive damages. It awarded Mr. Vine a total of $15,000 in compensatory damages and $375,000 in punitive damages. On October 10, 2003, the parties argued UTS's motion for *remittitur* and to apply the statutory cap. On that date, the parties also stipulated to $15,364.42 in backpay for Ms. Nault. Mr. Vine did not seek backpay.

## II. Motion for *Remittitur* and Statutory Cap Application

UTS's motion forwards two different premises: *remittitur* based on Supreme Court authority under *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (U.S.2003); and application of the statutory cap dictated by 42 U.S.C. § 1981a. UTS further contends, without authority, that I must first consider its motion for *remittitur*, and only afterward is it permissible to entertain the statutory cap application. I disagree and hold that the statutory cap may be applied before *remittitur* is considered.

### A. Order of Analysis

First, though the Tenth Circuit has not squarely addressed the issue, cases in the Tenth Circuit that have considered these two issues have first applied the statutory cap, then considered the constitutional challenge. *See, e.g., Deters v. Equifax Credit Info. Services*, 202 F.3d 1262 (10th Cir.2000) (considering constitutionality of a Title VII punitive damages award after statutory cap was applied at the trial level); *Jones v. Rent–A–Center, Inc.*, 281 F.Supp.2d 1277 (D.Kan.2003) (considering statutory cap application and constitution-

ality of punitive damages as two separate motions).

█ Second, it is within "the inherent power of every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936). Under that authority, the Court has discretion to determine the order in which it considers motions. *See, e.g., U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc.*, 39 F.3d 556, 560 (5th Cir.1994). This analysis comports with and accommodates the remedial purpose of Title VII and the Supreme Court's due process concerns. Here I elect to apply the statutory cap first, then conduct a constitutional analysis.

### B. Statutory Cap

Under 42 U.S.C. § 1981a(a)(1), "[i]n an action brought by a complaining party under [Title VII] ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b)...." Subsection (b) provides that "[t]he sum of the amount of compensatory damages ... and the amount of punitive damages awarded under this section ... shall not exceed, for each complaining party ... in the case of a respondent who has more than 14 and fewer than 101 employees ... $50,000." 42 U.S.C. § 1981a(b)(3)(A). UTS is such an employer.

UTS argues, and Plaintiffs concur, that the jury's compensatory and punitive damages award must be reduced to a sum of $50,000 for each plaintiff per the statutory cap. I therefore reduce Mr. Vine's and Ms. Nault's awards accordingly. Neither prevailing plaintiff shall be awarded more than $50,000 for the sum of their compensatory and punitive damages.

### C. Remittitur

UTS also argues that the prevailing Plaintiffs' punitive damage awards should be subject to *remittitur* and reduced to $5,000 for Ms. Nault and $15,000 for Mr. Vine under the authority of *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) and *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). I disagree.

■ Where a verdict is excessive against the weight of the evidence, the court may order a *remittitur* or direct that there be a new trial if plaintiff refuses to accept it. *See Holmes v. Wack*, 464 F.2d 86 (10th Cir.1972); Fed.R.Civ.P. 59. A trial court generally has the discretion to order a *remittitur*. *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1560 (10th Cir.1991). However,

> One limitation on the use of *remittitur* remains. It is not proper if the verdict was the result of passion and prejudice, since prejudice may have infected the decision of the jury on liability, as well as on damages. In those instances a complete new trial is required. 11 Charles Alan Wright et al., Federal Practice and Procedure § 2815 (2d ed.1995). *See also Mason*, 948 F.2d at 1560.

UTS does not contend and, having heard the evidence, I could not conclude that the verdict here was the result of passion and prejudice.

■ "[I]t is well established that there are procedural and substantive constitutional limitations on" punitive damages and, therefore, due process prohibits "the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Campbell*, 538 U.S. at ——–——, 123 S.Ct. at 1519–20. The reason is that "elementary notions of fairness enshrined in ... constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *Id.* at 1520 (internal citation omitted). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.*

■ In light of those concerns, the Supreme Court has instructed courts to consider three guideposts when reviewing punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* (citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589). Additionally, "in analyzing a punitive damages award for excessiveness, [a court must] consider the goal of deterrence." *Deters*, 202 F.3d at 1272. Each standard is satisfied here.

### 1. The Degree of Reprehensibility

■ "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. In determining UTS' reprehensibility, I consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, deceit, or mere accident." *Id.* at 576–77, 116 S.Ct. 1589. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be

presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Campbell*, 538 U.S. at ——, 123 S.Ct. at 1521.

UTS "certainly had notice that it could be subject to punitive damages for involvement in discriminatory practices with malice or with reckless indifference to an individual's federally protected rights, by virtue of the plain language of Title VII itself." *Deters*, 202 F.3d at 1272. Plaintiffs' case showed how, despite this notice, Mr. Chester's religious views saturated Plaintiffs' workplace. Plaintiffs' evidence established that Mr. Chester required them to recite and sign prayers at work. They introduced audiotapes of Mr. Chester preaching. Mr. Chester required Plaintiffs to listen to these tapes. Mr. Chester also criticized Ms. Nault's Catholic faith at a business meeting, had Mr. Vine reprimanded for wishing him "good luck," and discouraged employees from taking sick days because those days evidenced a lack of faith in God.

### a) Physical or Economic Harm

 Plaintiffs provided no evidence that Mr. Chester and UTS caused them physical harm. However, the personal nature of this dispute and testimony at trial indicates that the harm caused was not "merely economic," but psychological and emotional. Where, as here, an injury is "primarily personal, a greater ratio may be appropriate." *Deters*, 202 F.3d at 1273.

### b) Indifference or Reckless Disregard to Others

Testimony at trial established Mr. Chester's total indifference to Ms. Nault's and Mr. Vine's concerns. In one instance, when advised that his actions were likely illegal, Mr. Chester responded that UTS was his company and he would do as he pleased. Other testimony established that Mr. Chester "just didn't care" that his employees held different beliefs and were uncomfortable with his religious practices in the workplace. The other owners of UTS made no effort at all to stop Mr. Chester or otherwise alleviate the situation. Nor did UTS have a written employee complaint procedure regarding discrimination. In whole, testimony at trial established a total indifference and reckless disregard to the UTS employees.

### c) Financial Vulnerability, Frequency of Conduct, and Degree of Intent

Because the Plaintiffs were UTS employees and Mr. Chester's subordinates, they were in a position of financial vulnerability with respect to Mr. Chester and UTS. The conduct Plaintiffs complained of occurred repeatedly over a period of more than two years. Those acts included the distribution of evangelical audiotapes, a coerced signing of a "corporate" prayer, expectations of recitation of Mr. Chester's prayers, adherence to his religious philosophy, and lengthy evangelical messages at company dinners. The intentional and continuous nature of Mr. Chester's acts combined with his evidenced indifference toward the employees' well being shows Mr. Chester's and UTS's conduct to be much more than a "mere accident." *See Campbell*, 538 U.S. at ——, 123 S.Ct. at 1521.

### 2. The Disparity Between Actual or Potential Harm and the Punitive Damage Awards

The Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at ——, 123

S.Ct. at 1524. In practice, however, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* "Single-digit multipliers are more likely to comport with due process, while still achieving the . . . goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . or . . . 145 to 1." *Id.* Still, ratios greater than those may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Gore,* 517 U.S. at 582, 116 S.Ct. 1589. "A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* at 582–83, 116 S.Ct. 1589.

■ The jury awarded Mr. Vine $15,000 in compensatory damages. Applying the statutory damages cap decreases his punitive damage award to $35,000. Thus, the ratio of his punitive damages to his compensatory damages is 2.3 to 1. That ratio is well within constitutional bounds.

As to Ms. Nault, Plaintiffs request that I follow *Baker v. John Morrell & Co.,* 266 F.Supp.2d 909 (N.D.Iowa 2003) and include Ms. Nault's backpay award as compensatory damages in the computation of her punitive to compensatory damage ratio. That inclusion would bring Ms. Nault's ratio to approximately 2.25 to 1, clearly within constitutional bounds. Leaving *Baker* aside, Ms. Nault's punitive damages award still passes constitutional muster.

■ The jury awarded Ms. Nault $5,000 in compensatory damages. After application of the statutory damages cap, Ms. Nault's punitive damage award is reduced to $45,000. The ratio of her punitive to compensatory damages is thus 9 to 1. Ms. Nault's injuries were psychological and therefore difficult to quantify. UTS's

reprehensible conduct and fair notice of the statutory maximum again justify the ratio and is' well within the Constitution's bounds. In whole, neither ratio presents a guidepost evaluation that seriously calls into question the constitutionality of the revised punitive awards.

*3. The Disparity Between the Punitive Damages Award and the Civil Penalties for Comparable Cases*

Title VII—the only apparent remedy for UTS's actions of religious discrimination—limits compensatory damages against employers with more than 14 and fewer than 101 employees to $50,000. 42 U.S.C. § 1981a(b)(3)(A). The maximum award for comparable cases is therefore $50,000 in civil penalties. The present punitive awards of $35,000 and $45,000 are less than that maximum for civil penalties. This guidepost likewise favors upholding the revised punitive awards.

■ UTS argues that *Gore's* analysis requiring a "reasonable relationship" between a compensatory and punitive award renders improper the result here that Plaintiff Nault, though receiving less compensatory damages than Plaintiff Vine, will receive more punitive damages. However, the issue *Gore* and *Campbell* considered was whether the compensatory awards in those cases had a reasonable relation to their respective punitive awards, not whether one plaintiff's award was reasonably related to another plaintiff's award. Moreover, as Plaintiffs note, the jury awarded Plaintiffs Vine and Nault each $375,000 in punitive damages based on its evaluation of UTS's conduct. It is entirely sensible that those awards, based upon the same conduct, were identical before application of the statutory maximum.

As *Deters* noted,

Section 1981 a establishes a regime whereby the jury will set the damages,

without reference to the statutory cap. Then, if the damages awarded exceed the relevant limit, the district court shall reduce the amount so that it conforms to the statutory cap. The statutory cap is not the limit of a damages spectrum, within which the judge might recalibrate the award given by the jury . . .

Thus, only when an award would shock the judicial conscience, and constitute a denial of justice, for example because it would result in the financial ruin of the defendant or constitute a disproportionately large percentage of a defendant's net worth, will we reduce the award below the statutory cap. *Deters,* 202 F.3d at 1273 (citing *Luciano v. Olsten Corp.,* 110 F.3d 210 (2d Cir.1997) and *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992)) (internal quotations omitted).

UTS proffers no factual or legal argument sufficient to satisfy that standard. The awards of $50,000 to Plaintiffs Vine and Nault do not violate due process. I therefore decline to apply *remittitur* to either award.

Accordingly, IT IS ORDERED that:

(1) UTS's motion for *remittitur* of the jury's award and to apply the statutory cap is GRANTED IN PART and DENIED IN PART as follows:

(a) The motion is GRANTED as to application of the statutory cap; and

(b) The motion is DENIED as to further *remittitur* of the jury's award;

(2) Plaintiff Cynthia Nault shall be awarded a sum of $50,000 in compensatory and punitive damages as follows:

(a) Ms. Nault is awarded $5,000 in compensatory damages; and

(b) Ms. Nault is awarded $45,000 in punitive damages;

(3) Plaintiff David Vine shall be awarded a sum of $50,000 in compensatory and punitive damages as follows:

(a) Mr. Vine is awarded $15,000 in compensatory damages; and

(b) Mr. Vine is awarded $35,000 in punitive damages; and

(4) Plaintiff Cynthia Nault is further awarded, pursuant to the parties' stipulation, $15,364.42 in backpay.