**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 12 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RICHARD DONALD LONEDOG, III,

Defendant - Appellant.

No. 02-8065
(D.C. No. 01-CR-0133-J)
(District of Wyoming)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN** and **HOLLOWAY,** Circuit Judges, and **LUNGSTRUM**,[**] District Judge.[***]

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable John W. Lungstrum, United States District Judge for the District of Kansas, sitting by designation.

[***]After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**I.**

**A.**

The Procedural Background

Jurisdiction in the district court arose by virtue of 18 U.S.C. § 3231. Jurisdiction in this court arises by virtue of 28 U.S.C. § 1291.

On November 21, 2001, Lonedog was charged in a 21 count indictment on various drug, sexual abuse, assault and firearms charges. I App. 2-10 (Doc 1: Indictment). A jury rendered guilty verdicts as to Count One, distribution of marijuana to a minor in violation of 21 U.S.C. §§ 841(a)(1), 21 U.S.C. § 841(b)(1)(C) and 859; Count Nine, Sexual Abuse in violation of 18 U.S.C. §§ 2242;[1] Count Eleven, attempted distribution of marijuana to a minor in violation of 21 U.S.C. §§ 841(a)(1), 846, and 859; Counts Twelve and Fifteen, aggravated assault with a deadly weapon in violation of 18 U.S.C. § 1153 and Wyo. Stat. § 6-2-502(a)(iii); Counts Fourteen and Seventeen, use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii); and Count Eighteen, felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). I App. (Doc. 1 at 1-9); I App. (Doc. 91 at 1-6). Counts Nineteen, Twenty, and Twenty-One were voluntarily severed prior to trial, and dismissed without prejudice.

On June 25, 2002, Lonedog was sentenced to imprisonment of 180 months as to Counts One and Eleven, 180 months as to Count Nine, and 120 months as to Counts

_____

[1] This was a lesser included offense of the aggravated sexual abuse charge. I App. (Doc 91 at 3).

- 2 -

Twelve, Fifteen and Eighteen, all of which were to run concurrently to each other. Brief of Appellee (attachment: judgment at 3). In addition, he was sentenced to 60 months as to Count Fourteen, and 25 years as to Count Seventeen, both to run consecutively to each other and all other counts. *Id.* His total sentence was 45 years (540 months). Lonedog was also ordered to pay a special assessment of $800, and sentenced to 6 years' supervised release following his imprisonment. *Id.* at 4, 8.

**B.**

The Factual Background

Lonedog's indictment arose from several incidents that took place over the course of six months beginning in approximately May, 2001, and ending in October, 2001. An investigation of Lonedog began when officers of the Wind River Police Department on the Wind River Indian Reservation responded to a two vehicle crash just south of Riverton, Wyoming. III App. 6-8.[2] Lonedog was the driver of one car. IV App. 68-9. Trapped and injured in Lonedog's car were two teenage girls, NDJ, 15, and ALJ, 14. IV App. 40, 50, 68-69, 86. The initial investigation was of the car crash, but as the girls were being extricated from the car, various items of drug paraphernalia, some with possible drug residue, were found in the car. III App. at 7-11.

---

[2] The Wind River Police Department is an agency of the Bureau of Indian Affairs (BIA), United States Department of the Interior, and is responsible for law enforcement on the Wind River Indian Reservation. III App. 4-5 (Transcript of Testimony of Officer Steven Chief Goes Out).

At the hospital, all three occupants were given presumptive or screening drug tests of their urine for medical purposes. IV App. 220, 229-31.[3] These tests are screening rather than definitive tests which only provide positive or negative results. IV App. 223. Ms. Childers, the lab manager at Riverton Memorial Hospital, testified that pharmaceutical and over-the-counter drugs, such as "cold medications that contained ephedrine" and diet pills, could produce a positive reaction for the amphetamine/methamphetamine class of drugs. IV App. 224-25. The tests are examined at the hospital's laboratory. *Id.* at 220-21. Further testing that is more definitive is available to the hospital but those tests have to be sent to a reference laboratory. *Id.* at 223.

Lonedog tested positive for THC, NDJ positive for amphetamine and THC, and ALJ negative for any drug. IV App. 230-31. These tests were admitted over objections at a motion hearing before the trial and at trial to "corroborate" the testimony of NDJ and ALJ. IV App. 230-36. NDJ testified that Lonedog had given her marijuana in a pipe,

_____

[3] Ms. Childers explained the criteria for these drug tests during her testimony:
"Q. You do a . . . screen if you believe there is surgery . . .
[I]f you have a regular car wreck, do you always do – invariably do these tests if it looks like there is some injury?"
A. No.
Q. If it looks like there is serious injury, do you always use this test?
A. No.
Q. If it looks like there is going to be surgery, do you always do this test?
A. Yes. . . .
Q. If you have a person that's hurt and brought in on the gurney and not – Mr. Lonedog, you always do a test on a similar patient like that?
A. Not always, no." IV App. 233-34 (Testimony of Childers).

and she identified a pipe found in the car which contained THC residue as one Lonedog had offered her. IV App. 95-96, 106 (Testimony of NDJ), 199 (Testimony of Loring). ALJ testified that prior to the crash, Lonedog had also offered her marijuana and methamphetamine, but she had refused. IV App. 64, 67 (Testimony of ALJ). NDJ testified at trial about other times when Lonedog distributed methamphetamine and marijuana to her. IV App. 97-98, 111-15 (Testimony of NDJ). NDJ stated that at the time of the crash she was not using any prescription or over-the-counter medicines. IV App. 107-08. However, she also said that she did not remember using any methamphetamine that night but admitted that she might have done it and not remembered. *Id.* at 110-11. NDJ also testified about an incident in May, 2001, when Lonedog took her to a remote area and forcibly had sex with her. IV App. 119-23 (Testimony of NDJ).

Another incident occurred on August 4-5, 2001, and involved Lonedog and two different teenage girls, TLG and CMJ, both 16. V App. 328, 380. Earlier in the evening of August 4, 2001, Lonedog had argued with his girlfriend, now his wife, Nancy Spoonhunter, and her cousin Alvinita Lamebull in Riverton, had pointed a handgun at Lamebull, and made threats to kill Lamebull and the families of both Lamebull and Spoonhunter. IV App. 241-42, 244-47. Later that night, Lonedog picked up two of his nieces, who were both juveniles. V App. at 336-37, V App, 383-86. Despite their repeated requests to be taken home, he kept them with him while he drove around the

reservation looking for his girlfriend and talking about killing her and others. V App. 347-355, 386-392.

He drove past CMJ's house, went to his own house, and showed them a gun and ammunition. V App. 347-349. He then showed them a shotgun shell which he had loaded with salt and said "it could [expletive] up our face [sic]" if he shot them with it. V App. 349, 388. After leaving his house, Lonedog had a pistol in his hand and was waving it around in the direction of either one or both of the girls. V App. 352-354, 388-390. He made threats about shooting a man who had broken his windows and talked about shooting a woman named Nancy. V App. 386-87. When they asked to go home, he said, "I'll take you home when I'm ready because I'm the one with the gun and I'm the one with the car." V App. 350.

After approximately an hour, the police, having been alerted to Lonedog's threats to his girlfriend after the incident in Riverton, came upon Lonedog and the two girls in a housing area where the girlfriend's cousin, who had previously been threatened, lived. They arrested him after a brief scuffle and chase. IV App. 253, 259-268, V App. 306-311. The gun was subsequently recovered, along with other evidence. IV App. 268, 278-283 and V App. 292-294.

Following the accident, the Bureau of Indian Affairs had Lonedog's car towed to a salvage yard. On July 10, 2001, FBI Agent Swenson searched the area where the accident occurred and seized a roll of undeveloped film. IV App. 162. After Swenson

searched the area around the accident, he prepared an affidavit and submitted it to a magistrate judge to obtain a warrant to search Lonedog's impounded vehicle.

Upon reviewing the affidavit, the magistrate judge issued a search warrant and Swenson searched the vehicle. During the search, Swenson seized twelve rolls of undeveloped film and an ink pen cover with the ends cut off. Without obtaining a second search warrant, the FBI developed all thirteen rolls of undeveloped film (the one seized at the site of the accident and the twelve other rolls). A motion to suppress was granted in part to suppress the undeveloped rolls of film taken from the car pursuant to a search warrant, but the film seized from the accident site was admitted. These photographs showed Lonedog and his friends using drugs.

Prior to trial, Lonedog moved to suppress all of the photographs and the pen cover that was seized from the vehicle. In addition, Lonedog sought to suppress all of the fruits of the search and derivative uses as being outside the warrant.

## C.

### The Tafoya Testimony

This court reviews rulings excluding evidence for abuse of discretion, and we "reverse only if the exclusion of the evidence is so significant that it results in actual prejudice because it has a substantial and injurious effect or influence in determining the jury's verdict." *United States v. Fingado*, 934 F.2d 1163, 1164 (10th Cir.)(citations omitted), *cert. denied*, 502 U.S. 916 (1991). We may uphold evidentiary rulings on any

ground supported by the record, even if not relied upon by the district court. *United States v. Martinez*, 76 F.3d 1145, 1148 (10th Cir. 1996)(citations omitted).

Lonedog argues that the trial judge abused his discretion by excluding part of the testimony of Mary Tafoya, Lonedog's sister. We disagree. The jury found Lonedog guilty of Count One, distribution of marijuana to NDJ, a person under the age of 21; guilty of a lesser included offense under Count Nine, sexual abuse of the same victim, NDJ; and of Count Eleven, attempting to distribute marijuana to another person under the age of 21, ALJ. Lonedog concedes that if Tafoya's testimony was about a collateral matter, then the district court properly excluded it and he must accept NDJ's answers concerning her drug dealing and supplies. Appellant's Brief at 12. He cites, *inter alia*, *United States v. Olivo*, 80 F.3d 1466, 1470 (10th Cir. 1966), for the proposition contained in Fed.R.Evid. 608(b): "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence. They may, however, *in the discretion of the court*, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character of truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." (Emphasis added).

The Government points out that the issue, therefore, may be resolved by determining whether this evidence was "collateral" to the issue at trial. Brief of Appellee at 11. Lonedog asserts that Tafoya's testimony was not collateral because it was "offered

as a defense to the charge in addition to impeachment": it went to the issue of who supplied the drugs in Counts One, distribution of marijuana to a minor, and Eleven, attempted distribution of marijuana to a minor. Brief of Appellant at 12. Lonedog argued in the trial court, VI App. 515, and argues again to this court, Brief of Appellant at 12, that the proffered testimony of Tafoya would show that the "dope" at issue in Counts One and Eleven went not from Lonedog to NDJ, but rather from NDJ to Lonedog. The court replied, "You haven't established that. . . . In fact, the testimony directly contradicts it. This witness (Tafoya) has testified I never saw any delivery." VI App. 515 (Trial Transcript). The record shows that although Tafoya claimed that NDJ was a drug dealer, VI App. at 506, she testified that she never saw Lonedog buy drugs from NDJ. VI App. at 509 (Tafoya's testimony). Therefore we agree with the exclusion of the proffered portion of Tafoya's testimony. *See* VI App. at 501-23.

We also agree with the Government that even assuming Tafoya's proposed testimony was the truth – that NDJ was a door-to-door drug dealer – that fact is collateral to the issue of whether or not Lonedog distributed drugs to NDJ at a time when Tafoya was not present and could have had no direct knowledge of such a distribution. The trial judge's conclusion that "[t]he testimony offered here clearly is extrinsic evidence" is sound. VI App. 518 (Trial Transcript).

We agree with the trial judge's reasoning in applying Rule 608(b): "The reason for this rule of preventing extrinsic evidence so far as I know is that it does raise a host of new issues to be tried by the Court. In effect, the allegation puts the witness in this

matter, [NDJ] . . . on trial, not for her truthfulness in this matter, but as to a collateral issue, whether or not at various times she was a drug dealer." VI App. 519 (Trial Transcript). The trial judge noted that Lonedog had already questioned NDJ about drug use and dealing on cross-examination and that NDJ had "admitted that she had used marijuana . . . and methamphetamine in the past." *Id.* at 518-519. Additionally, the trial judge rejected Tafoya's testimony pursuant to Fed.R.Evid. 403, because "[i]t misleads the jury . . . [i]t confuses them," VI App. 515 (Trial Transcript), and since NDJ "has come into this courtroom, has admitted her use, possession of both methamphetamine and marijuana. . . . [t]his testimony is cumulative." *Id.* at 522.

In sum, the judge did not abuse his discretion and we affirm his ruling rejecting the proferred Tafoya testimony.

**D**

The Screening Drug Tests

This court reviews for abuse of discretion both the district court's denial of a preliminary evidentiary hearing concerning the admission of expert testimony pursuant to the principles of *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993), and Fed.R.Evid. 702, *United States v. Nichols*, 169 F.3d 1255, 1262-63 (10th Cir. 1999), and the district court's decision whether to admit or exclude expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)(*citing General Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997)). "An abuse of discretion occurs where the district court clearly erred or ventured beyond the limits of permissible choice under the circumstances." *Wright ex*

*rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1233 (10th Cir. 2001)(*citing Deters v. Equifax Credit,* 202 F.3d 1262, 1268 (10th Cir. 2000)).

Lonedog argues that the testimony and exhibits which showed that the passengers injured in the accident had a presumptive or screening drug test which showed NDJ as positive for methamphetamine and THC, ALJ negative for all drugs, and Lonedog positive for THC, were not admissible pursuant to Fed. R. Evid. 702. Lonedog also says that the trial judge erred in admitting this evidence because he violated the teachings of *Daubert*. We disagree.

Lonedog claims that, although he objected to the presumptive tests at the motion hearing and at trial, IV App. 226-231 (trial testimony), a *Daubert* test was never performed. We disagree because at trial the judge conducted what can be viewed as a *Daubert* test through the testimony of Dr. Ella Loring, Ph.D., senior forensic chemist/forensic scientist at the Wyoming State Crime Laboratory, IV App. 179 (Loring testimony), and the testimony of Hollie A. Childers, lab manager at Riverton Memorial Hospital, IV App. 216-17 (Childers testimony).

The Supreme Court in *Daubert* set out four flexible criteria to be applied in deciding the admissibility of a theory or technique, all of which were met by the combined testimonies of Loring and Childers: 1) whether it can be (and has been) tested; *Daubert,* 509 U.S. at 593, IV App. 203-04 (Loring testimony), IV App. 221-22 (Childers testimony); 2) whether the theory or technique has been subjected to peer review and publication; 509 U.S. at 593-94, IV App. 203 (Loring testimony), IV App. 184-86

- 11 -

(Loring testimony); 3) in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, 509 U.S. at 594, IV App. 203 (Loring testimony), IV App. 222 (Childers testimony); and 4) finally, "general acceptance" can yet have a bearing on the inquiry. 509 U.S. at 594, IV App. 203 (Loring testimony), IV App. 220 (Childers testimony).

We find that the trial judge did not abuse his discretion by admitting the screening tests and related testimony after he considered the *Daubert* factors. The district judge did not clearly err nor did he venture beyond the limits of permissible choice under the circumstances. *Wright,* 259 F.3d at 1233. The screening tests are questioned by Lonedog as lacking reliability based on Loring's statement that "[n]obody in the state of Wyoming, nobody in the whole country is testifying of positive usage of any drug based on the screening test," IV App. 209, and that "nobody can confirm their findings based on only the screening test." IV App. 210 (Loring testimony). However, Loring also stated that "it is a reliable screening test . . . very reliable." IV App. 203 (Loring testimony).

In sum, we are persuaded that considering this record as a whole, the trial judge did not err in his procedure under *Daubert* and the admission of evidence concerning the screening tests.

Although Lonedog does not emphasize the issue whether the screening tests and related testimony should have been excluded under Fed.R.Evid. 403, we consider this issue because Lonedog raised it below and briefly treats it in his opening brief here. *See* Brief of Appellant at 14. "The trial court has broad discretion to determine whether

- 12 -

prejudice inherent in otherwise relevant evidence outweighs its probative value." *United States v. Poole*, 929 F.2d 1476, 1482 (10th Cir. 1991); *United States v. Record,* 873 F.2d 1363, 1375 (10th Cir. 1989); *United States v. Esch*, 832 F.2d 531, 535 (10th Cir.), *cert. denied*, 485 U.S. 908 (1988). The determination of whether evidence is relevant lies "within the sound discretion of the trial court, and the court's determination will not be disturbed absent a clear showing of an abuse of that discretion." *Esch*, 832 F.2d at 535 (citing *United States v. Neal,* 718 F.2d 1505, 1509-10 (10th Cir. 1983), *cert. denied*, 469 U.S. 818 (1984)).

We turn now to the remaining argument of Lonedog based on a claim of error under Fed. R. Evid. 403 and 404. The gist of his contention on this point is that it was error to admit the screening test evidence and related testimony because the probative value of such evidence was heavily outweighed by its prejudicial value.

At a side bar discussion, the trial judge noted the limitations of the screening drug test evidence:

> " . . .The reason I hesitate is I believe the marijuana is a substance that stays in the body for much longer periods of time.
>
> Mr. Crofts [Government counsel]: That's true.
>
> The Court: - - like 30 days or so and it is water soluble.
>
> Mr. Crofts [Government counsel]: I think Dr. Loring said that.
>
> Mr. Blythe [Defense counsel]: I think so.

The Court: But I think that information is certainly available and really just creates arguments that can be made by counsel, which is perfectly fine. I'll overrule the objection, recognizing that the fact that he's positive on this day adds very little without something by way of a baseline before or something like that to show an increase within a time period, but it does tend to support the testimony that over the past week or so, there has been some use of marijuana."

IV at 228-29.

It is true that Lonedog was acquitted on Counts 2, 3, 4, 5, 6 and 7 which charged him with distribution to NDJ on dates prior to the accident and depended solely on NDJ's testimony. On the other hand, Lonedog was convicted on Count 1 regarding distribution of marijuana to a minor at the time of the accident, which was corroborated by testimony concerning the results of the drug tests. Despite such arguments, we are not persuaded to reverse the convictions and to reject the trial judge's determination under Rule 403. He has broad discretion to determine whether prejudice inherent in otherwise relevant evidence outweighs its probative value. *United States v. Poole*, 925 F.2d at 1482.

Thus, we are persuaded that the trial judge did not err in admitting the screening test evidence and related testimony under Rule 702 and *Daubert* or in his determination to admit the evidence as an exercise of his discretion under Rules 403 and 404.

**E**

The Photographs From the Film
Found at the Accident Site

Government trial exhibits 10, 11, 12, 13, 14, 15, 16 and 17 were admitted at trial over defendant's Fourth Amendment objections. The Brief of Appellant at 6 describes

the photographs. They were printed from the negatives and were introduced to show a pipe being used by people at a party. *See* Exhibits 10-17. This evidence came from an undeveloped roll of film which was discovered at the accident scene nine days after the accident and which the Government had developed. The Government responds to the Fourth Amendment objections by contending that the roll of film had been abandoned and the Fourth Amendment was therefore not implicated. Brief of Appellee at 23. We agree.

The test for abandonment is whether an individual has retained any reasonable expectation of privacy in the object. *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983)(citation omitted). The abandonment determination is made by objective standards. *Id*. at 1172. However, an expectation of privacy is a question of intent which may be inferred from words spoken, acts done, and other objective facts. *Id.* Here the district judge partially denied the defendant's motion to suppress evidence, which motion was based, in part, on the Fourth Amendment. In his Order Partially Granting Defendant's Motion to Suppress Evidence, the judge denied suppression of the exhibits discussed above. I App.(Doc. 94 at 2-3). In his discussion of the suppression issue he found that "this property was lost." *Id.* at 2. He did not specifically use the term "abandonment" but we view his ruling as finding "abandonment" in effect. The judge's order said that he did not believe there was a reasonable expectation of privacy in objects that are found in the middle of the street. I App. (Doc. 94 at 3). The judge noted that there is no reasonable expectation of privacy in property that spills outside of a vehicle

after an accident. The judge added that he found that the FBI did not seize the roll of undeveloped film in a manner that would implicate the Fourth Amendment.

We agree with the trial judge's rulings and are not persuaded by Lonedog's claim of error in the admission of the photographs in evidence. There is no reasonable expectation of privacy if a person leaves property in circumstances where it may be seized and searched. *See United States v. Garzon*, 119 F.3d 1446, 1450 (10th Cir. 1997).

**F**

Whether the Double Jeopardy Clause or the Rule
Against Multiplicitous Charges Were Violated

In the Brief of Appellant at 20-24 and in the Reply Brief of Appellant at 6-7, Lonedog argues that there was error in obtaining convictions and sentences in violation of the Double Jeopardy Clause and the rule barring multiplicitous charges. The gist of this argument is that "[m]ultiplicitous counts – those which are based on the same criminal behavior – are improper because they allow multiple punishments for a single criminal offense." *United States v. McIntosh*, 124 F.3d 1330, 1336 (10th Cir. 1997)(citation omitted). He says that the elements of the assimilated crime of aggravated assault (Wyoming Statute 6-2-502) are identical to the firearms charge under 18 U.S.C. § 924(c). Brief of Appellant at 24.

We do not agree with Lonedog's analysis. The Supreme Court has repeatedly applied the text of *Blockburger v. United States*, 284 U.S. 299 (1932), to determine the scope of Double Jeopardy protection: "[W]here the same act or transaction constitutes a

violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Id.* at 304 (citation omitted); *see also Texas v. Cobb*, 532 U.S. 162, 163 (2001); *Brown v. Ohio*, 432 U.S. 161, 164-66 (1977). The assumption underlying the *Blockburger* rule is that "Congress ordinarily does not intend to punish the same offense under two different statutes." *Whelan v. United States*, 445 U.S. 684, 692 (1980). Where two statutory provisions proscribe the same offense, they are construed not to authorize cumulative sentences "*in the absence of a clear indication of contrary legislative intent.*" *Id.* (emphasis added).

In the present case, Congress's legislative intent is very clear from the face of 18 U.S.C. § 924(c). There Congress broadly defined a predicate crime of violence as "any crime of violence . . . (including a crime of violence . . . which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device)." Then Congress clearly expressed its intent to impose a substantive consecutive sentence founded on one underlying act involving a firearm through the language of § 924(c) generally and the definition of crime of violence specifically.

In *United States v. Lanzi*, 933 F.2d 824, 826 (10th Cir. 1991), we held that "[t]he plain language of this [§ 924(c)] statute clearly evinces congressional intent that any defendant using a dangerous weapon in connection with a violent crime must be sentenced to five years imprisonment, such sentence to run consecutive to that imposed for the violent crime."

In sum, we are convinced that the judge did not err in sentencing Lonedog. His two convictions for violating § 924(c) are not barred by the Double Jeopardy Clause and the sentences were in accord with the congressional intent.

**G**

Lonedog was properly sentenced under 924(c) and the U.S. Sentencing Guidelines

The last issue we address concerns the statutory construction of 18 U.S.C. § 924(c) in relation to the application of the United States Sentencing Guidelines (U.S.S.G.). The standard of review for such claims is *de novo*. *United States v. Oberle*, 136 F.3d 1414, 1423 (10th Cir. 1998).

Lonedog argues that his 30 year sentence for two § 924(c) convictions should have been consecutive only to the guideline level (15) of the underlying violent assaults, not the overall guideline level (29) applicable to his criminal conduct as a whole as grouped under the guidelines. Brief of Appellant at 25-27. We do not agree with appellant and instead affirm the district court's decision.

The Government correctly notes that it is a "fundamental rule of statutory construction that all parts of a statute must be read together." *United States v. Diaz*, 989 F.2d 391. 392 (10th Cir. 1993)(citations omitted); Brief of Appellee at 35. We agree with the Government that Lonedog's argument is misleading because it quotes the language of § 924(c)(1)(A) out of the context of other, clarifying provisions of § 924(c). *Id.* Lonedog argues that "924(c) states that the 5 year and 25 year sentences are to be 'in addition to such crime of violence or drug trafficking offense-.'" § 924(c)(1)(A). Lonedog admits

that he has no authority supporting his position, saying that "Appellant was unable to find cases on point." Brief of Appellant at 26. We note that § 924(c)(1)(D)(ii) provides that the sentence to be imposed on those who violate § 924(c) may not run concurrently with "***any other term of imprisonment*** imposed on the person, including any term of imprisonment imposed for the crime of violence . . . during which the firearm was used . . ." (emphasis added). Thus, the plain language of the statute, when all parts are read together, clearly contradicts Lonedog's argument.

We also find convincing the Government's argument that Congress amended § 924(c) in 1984 to make clear to the courts that they had intended the sentence imposed for a violation of § 924(c) to run consecutively to *any other sentence*; thus, the phrase "including the underlying crime of violence" was added. Brief of Appellee at 35. Before that amendment, the Supreme Court had held that "prosecution and enhanced sentencing under § 924(c) is simply not permissible where the predicate felony statute contains its own enhancement." *Busic v. United States*, 446 U.S. 398 (1980). Congress, in large part in response to *Busic,* stated "[t]he Committee has concluded that subsection 924(c) should be completely revised to ensure that all persons who commit Federal crimes of violence, . . . receive a mandatory sentence, without the possibility of the sentence being made to run concurrently with that for the underlying offense or for any other crime and without the possibility of a probationary sentence or parole." 1984 U.S.C.C.A.N. 3182, 3491 (footnote omitted).

In addition, the Supreme Court in *United States v. Gonzales*, 520 U.S. 1, 5 (1997), held that the language of § 924(c) *forbids* a federal district court from directing that the mandatory sentence imposed [under § 924(c)] run concurrently with *any* other prison term, whether state or federal.[4] Section 924(c) sentences *must* be served consecutively to sentences imposed for all other crimes, including the underlying crime.

Also, the U.S.S.G. §§ 2K2.4(a) and 2K2.4 comment mandates that a § 924(c) sentence be imposed to "run consecutive to any other term of imprisonment." Thus, we affirm the district court's holding on this issue.

For these reasons, the judgment and sentences are AFFIRMED.

ENTERED FOR THE COURT

William J. Holloway, Jr.
Senior Circuit Judge

---

[4] "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.' Webster's Third New International Dictionary 97 (1976). Congress did not add any language limiting the breadth of that word, and so we must read § 924(c) as referring to all 'term[s] of imprisonment,' including those imposed by state courts." *Gonzales*, 520 U.S. at 5.