FILED
United States Court of Appeals
Tenth Circuit

July 27, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

TINA MARIE SOMERLOTT,

        Plaintiff - Appellant,

    v.

CHEROKEE NATION DISTRIBUTORS,
INC., an Oklahoma corporation; CND,
L.L.C., an Oklahoma limited liability
company,

        Defendants - Appellees.

No. 10-6157

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:08-CV-00429-D)**

_____

Jane W. Muir and Paula J. Phillips, Lawton, Oklahoma, for Plaintiff-Appellant.

Graydon Dean Luthey, Jr., GableGotwals, Tulsa, Oklahoma, for Defendants-
Appellees.

_____

Before **MURPHY**, **BRORBY**, and **GORSUCH**, Circuit Judges.

_____

**MURPHY**, Circuit Judge.

_____

# I. INTRODUCTION

Tina Marie Somerlott appeals from the district court's dismissal of her claims against CND, LLC ("CND") for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Somerlott brought federal employment discrimination claims against CND, alleging violations of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act. After allowing discovery by both parties, the district court concluded CND was immune from suit under the doctrine of tribal sovereign immunity and, therefore, dismissed Somerlott's complaint in its entirety. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms**.

# II. BACKGROUND

Somerlott worked as a chiropractic technician at a clinic which was part of the Reynolds Army Community Hospital in Fort Sill, Oklahoma. At the time of her termination in January of 2007, her employer was CND, which provided staffing pursuant to a Department of Defense contract to provide chiropractic care at the Army Hospital. CND is a limited liability corporation organized under the laws of the state of Oklahoma, wholly owned by Cherokee Nation Businesses, Inc. ("CNB"). CNB is a tribal corporation wholly owned and regulated by the Cherokee Nation (the "Nation"). The Nation is a federally recognized Indian Tribe. Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 75 Fed. Reg. 60810, 60810 (Oct. 1, 2010).

CND was originally formed as Cherokee Nation Distributors, Inc. ("CNDI"), a wholly owned subsidiary of Cherokee Nation Industries.[1] It was formed as an Oklahoma corporation. At the time of CNDI's creation, the Nation did not have laws permitting the formation of limited liability companies.[2] On April 29, 2004, CNDI was converted to an Oklahoma limited liability company and renamed CND, LLC. CND became a wholly-owned subsidiary of CNB on February 1, 2008, pursuant to the Nation's Jobs Growth Act of 2005.

Somerlott brought suit against CND on April 23, 2008, alleging employment discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, and the Age Discrimination in Employment Act, 29 U.S.C. §623. CND moved to dismiss, arguing it was protected from suit under the doctrine of tribal sovereign immunity and that it was not an "employer" under Title VII, *see* 42 U.S.C. § 2000e(b)(1) (excluding Indian tribes from definition of "employer"). The district court deferred ruling on the motion, granting limited discovery on the issue of whether CND is shielded by the Nation's sovereign immunity. During the pendency of this discovery period, Somerlott amended her complaint and CND filed a new motion to dismiss arguing not only that it was protected by

---

[1] Somerlott initially named CNDI in her complaint, but later amended her complaint to include CND. The distinction between these entities is not material to the court's resolution of this appeal.

[2] The Cherokee Nation Limited Liability Company Act, Legislative Act 32-04, was passed in 2004, and the Cherokee Nation General Corporation Act, Legislative Act 96-16, was passed in 1996.

tribal sovereign immunity and the tribal exemption to Title VII, but also that it was exempt from the ADEA. *See EEOC v. Cherokee Nation*, 871 F.2d 937, 939 (10th Cir. 1989). Somerlott filed her response to CND's motion to dismiss on October 16, 2009.

Somerlott's response to CND's motion focused primarily on the statutory exemption issue. She argued: "The Indian Tribe's relationship to CND is so attenuated that CND cannot be entitled to the Tribe's exemption from the strictures of Title VII and the ADEA." She attempted to distinguish *EEOC v. Cherokee Nation* by arguing CND's activities were not intramural and did not implicate the Nation's treaty-protected rights to self-governance. After discussing several cases concerning the applicability of the ADEA to tribes and tribal entity, Somerlott stated: "A review of the relevant case law where a tribe or arm of a tribe is given exemption has as a common element intramural disputes or matters affecting a tribe's self-governance." Because the activities giving rise to her claim—the operation of a chiropractic clinic serving non-Indian clients—are not normally considered governmental functions, Somerlott argued, neither the Title VII exemption nor the ADEA exemption should apply to CND.

In analyzing CND's motion to dismiss, the district court undertook to determine whether CND constituted a "subordinate economic entity" of the Nation entitled to share in the Nation's sovereign immunity. Noting that, "[a]lthough the subordinate economic entity analysis has been widely adopted, its

implementation is rarely uniform," the district court considered a variety of factors used by other courts to determine whether the relationship between a tribe's economic entities and the tribe itself is sufficiently close for immunity to apply. The court concluded CND met "most, if not all" of the criteria used by courts to determine whether a tribal commercial enterprise is a subordinate economic entity of a tribe. The court also rejected Somerlott's argument that CND's activities were too attenuated from the Nation's interest in self-governance. *See Kiowa Tribe of Okla. v. Mfg. Techs, Inc.*, 523 U.S. at 757–58 (1998). Accordingly, the court granted CND's motion to dismiss.

On appeal, Somerlott identifies three issues for review. First, she states: "The district court erred in extending tribal sovereign immunity to the defendant corporations, which have a tribal stakeholder, without regard to whether their activities were sufficiently connected with the self-governance of the tribe to warrant such immunity." Second, she argues: "The court erred in finding that CND/CNDI are exempt from the ADEA, where Congressional enactment of the [Small Business Act] serves as evidence of legislative intent to include them." Finally, she argues: "The court erred in entering judgment before CND/CNDI provided required responses to plaintiff's outstanding discovery." Approximately ten days before Somerlott served her Opening Brief, this court decided *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1187 (10th Cir. 2010) [hereinafter "*BMG*"]. CND's Response Brief

-5-

relied almost exclusively on *BMG* for the proposition that it was a subordinate economic entity of the Nation entitled to share in its immunity. CND also (correctly) noted the district court made no finding as to whether it was entitled to the ADEA exemption, and responded to Somerlott's argument concerning the district court's handling of the jurisdictional discovery in the case.

This court ordered the parties to submit supplemental briefs addressing whether CND's organization as a separate legal entity under Oklahoma's Limited Liability Company Act precluded it from sharing in the Nation's immunity. The parties were also ordered to discuss whether the argument that such organization precluded CND from sharing in the Nation's immunity was properly before this court in light of the prior briefing to the district court and to this court.

## III. DISCUSSION

### A.    Standard of Review

Ordinarily, determining whether CND shares the Nation's sovereign immunity from suit involves a mixed question of law and fact. *BMG*, 629 F.3d at 1181–82. Therefore, the district court's factual findings are reviewed for clear error and its legal conclusions are reviewed de novo. *Id.* at 1182. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1175 (10th Cir. 2010)

(quotations omitted). However, when an argument was not raised before the district court but is instead advanced for the first time on appeal, the court will only reverse if the appellant shows the district court's decision amounted to plain error. *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011).

B.    **Sovereign Immunity**

It is well-established that "Indian tribes are distinct, independent political communities, retaining their original natural rights in matters of local self-government. Although no longer possessed of the full attributes of sovereignty, they remain a separate people, with the power of regulating their internal and social relations." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (citations and quotations omitted). As sovereign powers, Indian tribes are immune from suit absent congressional abrogation or clear waiver by the tribe. *Kiowa Tribe*, 523 U.S. at 753. "Tribal immunity extends to subdivisions of a tribe, and even bars suits arising from a tribe's commercial activities." *Native Am. Distrib. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1292 (10th Cir. 2008) (citing *Kiowa Tribe*, 523 U.S. at 759). The applicability of tribal sovereign immunity does not depend on whether the activities giving rise to the litigation occurred on or off tribal land. *Kiowa Tribe*, 523 U.S. at 754. Nor does it depend on whether the tribe is directly responsible for the financial liabilities of its sub-entities. *BMG*, 629 F.3d at 1181.

In *BMG*, this court sought to determine whether a tribally owned casino and development authority were protected from suit by the tribe's sovereign immunity. 629 F.3d at 1176–77. Plaintiff BMG was a Colorado corporation providing online business management training and consulting services. 629 F.3d at 1177. Defendant Chukchansi Gold Casino and Resort was operated for the benefit of a federally recognized Indian tribe, the Picayune Rancheria of the Chukchansi Indians of California. *Id.* at 1177 n.2. BMG alleged the Casino had unlawfully copied and used online training materials to train multiple employees when the Casino purchased only a single-user license. *Id.* at 1177. It brought suit against the Casino, the Chukchansi Economic Development Authority, which operated the casino, and the tribe itself, raising various federal and state law claims. *Id.* at 1177–78. The defendants moved to dismiss, arguing the court lacked subject matter jurisdiction under the doctrine of tribal sovereign immunity. *Id.* at 1178. The district court denied the motion, applying a test under which a tribe's economic entities could not share in the tribe's sovereign immunity without first showing that a judgment against the entities would result in direct financial liability for the tribe or otherwise imperil the tribe's assets. *Id.* at 1179. This court reversed, holding the district court applied the wrong legal standard by treating "the financial impact on a tribe of a judgment against its economic entities as a threshold inquiry." *Id.* at 1181. Instead, to determine whether a tribe's economic entity is entitled to share in the tribe's immunity, this court set

forth a six-factor test for assessing the closeness of the relationship between the entity and the tribe. *Id.*

In concluding a subordinate economic entity analysis applied to this case, the district court overlooked a crucial distinction between CND and the entities at issue in previous cases in which the test has been applied: CND is incorporated under state law. By contrast, the entities to which a subordinate economic entity test has traditionally been applied, like the Casino and Authority in *BMG*, have all been organized, in some form or another, under tribal law. *See id.* at 1191; *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046–47 (9th Cir. 2006) (applying analysis to casino organized pursuant to tribal ordinance and interstate gaming compact); *Johnson v. Harrah's Kan. Casino Corp.*, No. 04-4142, 2006 WL 463138, at *2–8 (unpublished) (D. Kan. Feb. 23, 2006) (concluding tribal sovereign immunity does not extend to Nevada corporation conducting tribal business pursuant to contract with the tribe); *see also* Felix S. Cohen, Handbook of Federal Indian Law § 7.05(1)(a) (2005 ed.) ("Although the immunity extends to entities that are *arms of tribes*, it apparently does not cover *tribally chartered corporations* that are completely independent of the tribe." (emphasis added) (citation omitted)).[3]

---

[3]Recently, the United States District Court for South Dakota applied the *BMG* test to a tribal entity incorporated under state law, concluding the entity's organization as a state corporation was merely one consideration among others when weighing the *BMG* factors. *See J.L. Ward Assocs. v. Great Plains Tribal*
(continued...)

Thus, the subordinate economic entity test is inapplicable to entities which are legally distinct from their members and which voluntarily subject themselves to the authority of another sovereign which allows them to be sued. *See* Okla. Stat. tit. 18, § 2004(B)(1) ("A limited liability company formed under this act is a separate legal entity . . . ."); *id.* § 2003(1) ("Each limited liability company may . . . [s]ue, be sued, complain and defend in all courts . . . ."). This approach is consistent with the traditional treatment of the sovereign immunity of the United States. While tribal sovereign immunity is not coextensive with that of the states, *Kiowa Tribe*, 523 U.S. at 756, "[t]ribal sovereign immunity *is* deemed to be coextensive with the sovereign immunity of the United States." *Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1011 (10th Cir. 2007) (emphasis added). In that context, courts have held the United States' sovereign immunity does not extend to its sub-entities incorporated as distinct legal entities under state law. For example, when the United States formed and became the sole shareholder of the Panama Railroad Company, a New York corporation, courts held the corporation was distinct from the United States and did not share its immunity. *See Panama R. Co. v. Curran*, 256 F. 768, 771-72 (5th Cir. 1919)

---

[3](...continued)
*Chairmen's Health Bd.*, 2012 WL 113866, at *12 (D.S.D. Jan. 13, 2012). This court concludes *J.L. Ward* is unpersuasive insofar as it would result in tribal sovereign immunity being broader than the sovereign immunity of the United States. *See Miner Elec., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007, 1011 (10th Cir. 2007) ("Tribal sovereign immunity is deemed to be coextensive with the sovereign immunity of the United States.").

(citing *Bank of the United States v. Planters' Bank of Ga.*, 22 U.S. 904, 907–908 (1824))*; Salas v. United States*, 234 F. 842, 844–45 (2d Cir. 1916) ("When the United States enters into commercial business it abandons its sovereign capacity and is to be treated like any other corporation."). The court can identify no reason to depart from this principle here. Accordingly, CND, a separate legal entity organized under the laws of another sovereign, Oklahoma, cannot share in the Nation's immunity from suit, and it is not necessary to apply the six-factor *BMG* test.

## C.    Preservation

While this court has no doubt the subordinate economic entity doctrine is inapplicable on the facts of this case, after reviewing the record the court concludes Somerlott did not properly preserve this basis for reversal before the district court. "An issue is preserved for appeal if a party alerts the district court to the issue and seeks a ruling." *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1141 (10th Cir. 2007). The majority of Somerlott's arguments before the district court were not directed to the issue of sovereign immunity at all, but rather toward the separate issue of whether the statutory and non-statutory exemptions for Indian Tribes in Title VII and the ADEA applied to the Nation. To the extent Somerlott did discuss tribal sovereign immunity, she agreed the subordinate economic entity/arm of the tribe analysis was the appropriate rubric through which to analyze her claims. For example, she argued

-11-

"[B]ecause CND does not meet the definition of an arm of the Tribe as required for immunity, its Motion to Dismiss should be denied." Although it resolved the test against her, the district court interpreted Somerlott as conceding the applicability of the subordinate economic entity test, stating: "Upon application of the 'arm of the tribe' rationale *advocated by Plaintiff*," CND meets most, if not all, of the criteria commonly used by courts in determining whether or not a tribal commercial enterprise is an 'arm of the tribe.'"

In her response to the motion to dismiss, Somerlott admittedly emphasized CND's status as a corporation and business entity, but she never argued this fact in itself precluded CND from sharing in the Nation's immunity. More importantly, she did not argue CND's status as a separate legal entity rendered the subordinate economic entity test inapplicable. She made no reference to Oklahoma's Limited Liability Corporation Act or its provisions stating such entities may "sue and be sued." Moreover, she advanced no argument concerning the coextensive nature of tribal sovereign immunity and that of the United States. Instead, she took the position CND's activities were insufficiently connected with traditional government functions to share in the tribe's immunity, a position the Supreme Court squarely rejected in *Kiowa Tribe*. 523 U.S. at 757–58. Somerlott advanced substantially the same position in her initial briefing on appeal.[4] In

---

[4]In addition to her central argument that CND's activities were insufficiently connected to tribal government functions, Somerlott also argued

(continued...)

-12-

response to this court's order for supplemental briefing, however, she advocated the rule now adopted in this decision, which is at best only tangentially related to the sole position she presented to the district court. As a consequence, her arguments were not sufficiently preserved in the district court. *See Ecclesiastes 9:10-11-12*, 497 F.3d at 1142 (noting that a party's challenge to the district court's analysis of a rule does not preserve a challenge to the applicability of the rule itself.)

A panel of this court recently held that arguments raised for the first time in a civil appeal may be reviewed only for plain error. *Richison*, 634 F.3d at 1128. Plain error is (1) error, (2) which is plain, (3) which affects substantial rights, (4) and which seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* The burden of establishing plain error lies with the appellant. *Id.* at 1130. In civil cases, this burden is "extraordinary . . . [and] nearly insurmountable." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 802 (10th Cir. 2001). Somerlott has not carried that burden here. In her initial brief before this court, Somerlott did not even attempt to show how the district court's use of the subordinate economic entity test was plain error. Further, even when given the express opportunity to present a comprehensive plain error argument in a

---

[4](...continued)
CND could not share in the Nation's immunity because it was not organized pursuant to the Oklahoma Indian Welfare Act. This position, too, was forfeited before the district court, because Somerlott made no mention of OIWA whatsoever.

supplemental brief, Somerlott has failed to do so. *See Richison*, 634 F.3d at 1131 ("the failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.") Instead, she simply emphasizes that the issue is purely legal and involves an important issue of public policy. While these considerations are legitimate, they are insufficient to warrant reversal under this court's binding precedent. *Richison*, 634 F.3d at 1129.

Even assuming the district court's erroneous application of the subordinate economic entity analysis was plain and affected Somerlott's substantial rights, Somerlott wholly fails to argue the district court's decision meets the fourth prong of the plain error test in her opening brief, her reply brief, or even her supplemental brief after having been specifically ordered to brief plain error. Instead, Somerlott summarily argues the case implicates a matter of great public importance and that failure to reverse would result in "manifest injustice." She cites *Rademacher v. Colorado Association of Soil Conservation Districts Medical Benefit Plan*, 11 F.3d 1567, 1572 (10th Cir. 1993) for the proposition that this court may exercise its discretion to consider matters not raised below in certain circumstances, such as "issues regarding jurisdiction and sovereign immunity, and instances where public interest is implicated, or where manifest injustice would result." *Id.* at 1572–73 (citations omitted). Although *Rademacher* identifies sovereign immunity as an issue this court has been willing to consider for the first

-14-

time on appeal, this court has always maintained a distinction between its obligation to consider arguments which might undermine its subject matter jurisdiction and arguments which might support it. *See Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1541 (10th Cir. 1992) ("[O]ur responsibility to ensure even sua sponte that we have subject matter jurisdiction before considering a case differs from our discretion to eschew untimely raised legal theories which may support that jurisdiction.").

Finally, although Somerlott repeatedly asserts "manifest injustice" would result if the court declined to reverse on her newly raised theory, she fails to identify any particular injustice beyond the loss of her possibly meritorious claim. This argument relates to the third prong of plain error review; something more is needed to satisfy the fourth prong. *See United States v. Olano*, 507 U.S. 725, 737 (1993) (concluding a plain error affecting substantial rights does not in itself seriously affect the fairness, integrity, or public reputation of judicial proceedings).

### D.    Rule 59(e) Issue

Somerlott contends the district court erred in dismissing her claim "before CND/CNDI provided required responses to [her] outstanding discovery." As a threshold matter, the court agrees with CND that the issue before the court for review is not the denial of discovery but rather the propriety of the district court's order denying Somerlott's Motion to Set Aside Order of Dismissal. The district

-15-

court properly characterized this motion as a motion to alter or amend a judgment under Rule 59(e) of the Federal Rules of Civil Procedure. *See Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997) ("[A] motion will be considered under Rule 59(e) when it involves reconsideration of matters properly encompassed in a decision on the merits." (quotations omitted)).

The court reviews the denial of Rule 59(e) relief for abuse of discretion. *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1523 (10th Cir. 1992). "Under an abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Wright ex rel. Trust Co. of Kansas v. Abbot Labs., Inc.*, 259 F.3d 1226, 1235 (10th Cir. 2001) (quotation omitted). The court "will not alter a trial court's decision unless it can be shown that the court's decision was an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id.* at 1236 (quotation omitted).

Somerlott filed her complaint against CNDI on April 23, 2008. On June 16, 2008, CNDI moved to dismiss pursuant to Rule 12(b)(1) arguing the district court lacked subject matter jurisdiction under the doctrine of tribal sovereign immunity. When considering a motion to dismiss under Rule 12(b)(1) the court may consider evidence extraneous to the complaint itself without converting the motion to a Rule 56 motion for summary judgment. *Wheeler v. Hurdman*, 825

F.2d 257, 259 n.5 (10th Cir. 1987). The district court therefore permitted Somerlott to conduct limited discovery relating to the sovereign immunity issue in an order entered August 8, 2008.

Between then and April 17, 2009, the district court granted five requests for extensions of time for Somerlott's response to the motion to dismiss. On May 26, 2009, three days after her Response to the Motion to Dismiss was due, Somerlott amended her complaint, adding CND as a defendant. Defendants filed a superseding motion to dismiss on June 23, 2009, which expanded their original arguments relating to tribal sovereign immunity and raised new arguments not at issue on appeal. On July 22, 2009, Somerlott requested another extension of time to file her response and informed the court she anticipated requesting additional discovery. The court granted this motion on July 24, 2009, making Somerlott's response to the motion to dismiss due on September 30, 2009.

On September 17, Somerlott filed yet another motion for an extension of time as well as motions to compel discovery responses. The district court struck the motions to compel because Somerlott failed to comply with the court's local rules. It also denied the motion for an extension of time, concluding Somerlott had "received ample opportunity to conduct any discovery she deemed necessary, and she has not acted diligently to pursue any outstanding discovery materials that she desired." On September 22, Somerlott filed two amended motions to compel, as well as another motion for an extension of time. The district court

-17-

summarily denied the motion for a further extension of time. Undeterred, on September 24 Somerlott filed a motion for reconsideration of her original motion to continue. Although the district court "[found] that Plaintiff has not presented any new fact or other proper basis for reconsideration of the prior orders denying Plaintiff a third extension of time . . . to complete discovery and respond to Defendants' Motion to Dismiss," it nonetheless "grant[ed] Plaintiff's alternative request for a brief enlargement of time to prepare and file her response."

By January 7, 2010, CND's motion to dismiss was fully briefed, including supplemental declarations and notices of authority filed by both parties. The motions to compel were set for a February 4, 2010, hearing. At the hearing, the parties informed the court they had resolved almost all discovery issues by agreement with the exception of one Interrogatory and a related Request for Production concerning CND's financial records.

The parties now dispute their respective obligations under this agreement. While they agree CND's obligation to provide additional discovery was conditioned on the court's entry of a protective order, Somerlott argues she was under no obligation to cooperate with CND in submitting a joint motion for such an order. The parties initially did cooperate and submitted a joint motion for an agreed-upon protective order on February 12, 2010. The district court, however, denied the motion without prejudice because of several deficiencies, most generally because the proposed order was overbroad in scope. No revised order

-18-

was submitted. Pursuant to the parties' agreement announced at the February 4 hearing, on February 23, 2010, the district court denied as moot substantially all of the motion to compel. Nearly seven weeks later, on April 16, 2010, the district court granted CND's motion to dismiss.

Grounds for granting a Rule 59(e) motion include "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Where a party seeks Rule 59(e) relief to submit additional evidence, "the movant must show either that the evidence is newly discovered [or] if the evidence was available at the time of the decision being challenged, that counsel made a diligent yet unsuccessful effort to discover the evidence." *Comm. for First Amendment*, 962 F.2d at 1523. The district court concluded Somerlott failed to act diligently in pursuing her outstanding discovery requests and therefore concluded she failed to make the necessary showing for Rule 59(e) relief.

This determination did not "exceed the bounds of permissible choice" under the circumstances. *See Wright*, 259 F.3d at 1235. As of February 26, 2010, CND's counsel informed Somerlott's counsel it would not be providing any additional discovery without a protective order, that it considered Somerlott's counsel to be in breach of the parties' agreement, and that additional discovery issues needed to be "set . . . before the court for resolution." Somerlott was at

-19-

that point on notice the defendants did not intend to disclose any additional material absent a court order. Nonetheless, she took no action for over seven weeks. The district court's conclusion that this delay, considered in context of Somerlott's numerous prior requests for extensions of time, amounted to a lack of diligence, was not "arbitrary, capricious, whimsical, or manifestly unreasonable," and therefore will not be disturbed on appeal. *See id.* at 1236.

## IV. CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the decision of the district court.

10-6157, *Somerlott v. Cherokee Nation Distributors, Inc.*

**GORSUCH, J.**, concurring

I am pleased to join the court's opinion.  I agree with the court's first holding — that under clear and long entrenched federal law a chiropractic business is no surreptitious sovereign entitled immunity from suit.  I also agree with the court's second holding — that Ms. Somerlott failed to preserve the arguments necessary to prevail on this score.  I write separately to explain my reasons for reaching the first conclusion because both parties have exhibited considerable confusion about it.

Sometimes the solution to a problem comes clear by stating it.  CND, LLC wants sovereign immunity.  But CND, LLC is in the business of manipulating spines for profit.  It serves mostly non-Indians and operates off reservation.  It was formed under Oklahoma's limited liability statutes.  Those statutes define it as a "separate legal entity" from its shareholder (currently, the Cherokee Nation); one that can "sue, be sued, complain and defend in all courts"; and one whose assets can be sold to private persons at any time.  *See* 18 Okla. Stat. § 2004(B)(1); *id.* § 2003(1) and (4).  Given all this, it's no wonder CND is unable to cite any authority that might immunize it from suit as some sort of secret sovereign.

Of course, Indian tribes are entitled to sovereign immunity absent congressional abrogation.  *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 759 (1998).  And, of course, this immunity is not limited by the type of activity involved or where it takes place.  *Id.* at 758.  But no matter how broadly

conceived, sovereign immunity has never extended to a for-profit business owned by one sovereign but formed under the laws of a second sovereign when the laws of the incorporating second sovereign expressly allow the business to be sued. And it doesn't matter whether the sovereign owning the business is the federal government, a foreign sovereign, state — or tribe.

Take the federal government. When the federal government chooses to act through a state-incorporated entity, courts hold those corporations to be just what they appear to be and subject to suit under the terms specified by state law. So if (as here) the state in question conditions the privilege of creating a corporate entity under its laws on an agreement the new entity will be amenable to suit, that condition must be respected even when the incorporator is the federal government. One sovereign, after all, cannot usually rewrite the laws of another. *See Fed. Sugar Ref. Co. v. U.S. Sugar Equalization Bd., Inc.*, 268 F. 575, 584 (S.D.N.Y. 1920) ("If the [federal] sovereign thus chooses as its agent a state corporation which can be sued it cannot by ipse dixit deprive one injured by such agent of the right to sue."); *see also Salas v. United States*, 234 F. 842, 844-45 (2d Cir. 1916) ("When the United States enters into commercial business" under the laws of New York, it "is to be treated like any other corporation"); *Panama R.R. Co. v. Curran*, 256 F. 768, 771-72 (5th Cir. 1919).

The same principle holds with foreign sovereigns. At common law, a foreign government's decision to incorporate a business under a state's

commercial laws didn't afford that business immunity but subjected it to suit according to the terms prescribed by state law. "When a [foreign] government becomes a stockholder in a [state] corporation, it does not exercise its sovereignty as such. 'It acts merely as a corporator, and exercises no other power in the management of the affairs of the corporation than are expressly given by the [state law] incorporating act.'" *Amtorg Trading Corp. v. United States*, 71 F.2d 524, 529 (C.C.P.A. 1934) (quoting *Bank of Ky. v. Wister*, 27 U.S. (2 Pet.) 318, 324 (1829)); *Restatement (Second) of Foreign Relations Law* § 66(g) (1965); *id.* Reporters' Notes 2(a). And this longstanding common law rule has now been deliberately codified in the Foreign Sovereign Immunities Act. *See* 28 U.S.C. § 1603; H.R. Rep. No. 94-1487 at 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6614 (citing *Amtorg*, 75 F.2d 524).

Even a state is generally held to the terms of its own corporate laws when it chooses to incorporate an entity. *See, e.g.*, *Bank of the U.S. v. Planters' Bank of Ga.*, 22 U.S. (9 Wheat) 904, 907 (1824) (Marshall, C.J.); *Bank of Commonwealth of Ky. v. Wister*, 27 U.S. at 322. To be sure, a state may enact laws allowing the creation of governmentally-owned, special purpose "public" corporations — typically to perform chores comparable to those of a government agency, like running a port authority or a university. *See, e.g.*, *P.R. Ports Auth. v. Fed. Maritime Comm'n*, 531 F.3d 868, 874-877 (D.C. Cir. 2008) (noting that sovereign immunity extends only to those state-owned corporations both immune as a matter

of state law and performing "typical" state functions). And to be sure these public corporations are sometimes treated as "arms of the state" and endowed with sovereign immunity. *See, e.g.*, *Regents of the Univ. of Calif. v. Doe*, 519 U.S. 425, 429-30 (1997); *see also P.R. Ports Auth.*, 531 F.3d at 882-83 (Williams, J., concurring) (questioning the wisdom of this development). But there is no suggestion that an arm-of-the-state "public corporation" like this is ever created under Oklahoma's *general* incorporation statutes. *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 667 (1979) (applicability of a statute to the sovereign depends upon "context, the subject matter, legislative history, and executive interpretation."). Let alone on behalf of another sovereign.

And this point leads to a related one. CND's claim to immunity is not only inconsistent with longstanding *rules* governing sovereign immunity. It is also at odds with the *reasons* for those rules. The great innovation and advantage of the corporate form (and surely the cause of some problems, too) lies in the fact that it involves the creation, the embodiment, the bringing into being of a new entity with responsibilities and liabilities legally distinct from those of its incorporators and shareholders. *See* James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 7.1 (2011) ("Recognition of a corporate personality is considered to be the most distinct attribute of the corporation."). As a legally distinct entity created, embodied, brought into being by law of a sovereign, a corporation is, at the same time, generally defined by and subject to the privileges

-4-

and responsibilities provided by that sovereign's laws. A corporation isn't a natural person endowed with inalienable rights, but an "artificial being" that may exercise only those privileges the law "confers upon it, either expressly, or as incidental to its very existence." *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819) (Marshall, C.J.); *see also Sloan Shipyards Corp. v. Shipping Bd. Emergency Fleet Corp.*, 258 U.S. 549, 567 (1922) ("The meaning of incorporation is that you have a person, and as a person one that presumably is subject to the general rules of law"); Seymour Thompson, *Commentaries on the Law of Private Corporations* § 2101 (1912) ("Corporations, which are known as artificial persons, cannot rightfully do anything that is not expressly or by necessary implication permitted by the law of their being.").

CND's claim to immunity is inconsistent with this foundational feature of corporate law. It chose to incorporate under Oklahoma's general limited liability company statute. And that statute expressly: (1) defines corporations created under its terms as "separate legal entit[ies]" with rights and responsibilities separate and distinct from those of their shareholders; and (2) specifies that the rights and responsibilities of corporations created under its terms include the duty to answer lawsuits in any court. 18 Okla. Stat. §§ 2003, 2004. These traits thus came part and parcel with CND's birth. They are part of its charter, entwined in its corporate DNA. And no one does (or could) suggest these statutorily defined characteristics infringe any privileges, constitutional or otherwise, necessarily

-5-

incidental to a corporation's creation. *Cf. First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784 (1978) (noting that some constitutional protections come with corporate existence). Yet CND wishes to ignore them all the same, to disregard essential components of its charter, to overwrite its corporate DNA, to treat it as indistinct from its (ultimate and indirect) shareholder, and to deny others the ability to sue it. CND wants to exercise the privilege of incorporating, of coming into being, under Oklahoma law but without accepting the responsibilities attending that privilege.

Neither is that the end of it. While it wishes to disregard certain fundamental features of its Oklahoma corporate charter, no doubt CND wishes to retain and rely on others it finds useful. It seems highly likely, for example, that CND wants to retain the right given to it by state law to sell its assets or even ownership to private purchasers if and when it chooses to do so. *See* 18 Okla. Stat. § 2003. And absent immunity from suit, CND would surely insist courts respect (not ignore) its legal independence from its shareholders (whoever they may be at the time) and shield them from potential liability accordingly. In this way, then, CND asks us to codify an entirely new and different corporate law than Oklahoma has, one that picks and chooses the privileges CND finds advantageous without the responsibilities it finds nettlesome. Neither can CND explain how the attributes it wants to retain comport with its claim to sovereignty. After all, how might it really be part of a tribal sovereign but at the same time be freely

-6-

tradeable to private owners? And how can it claim to be identical to the tribe yet sufficiently distinct from the tribe that tribal assets may not be placed at risk? *See Providence Eng'g Corp. v. Downey Shipbuilding Corp.*, 294 F. 641, 647-48 (2d Cir. 1923) ("'[i]f a corporation is formed by the state with transferable shares for the purpose of carrying on . . . business in the same manner as a private corporation, it must be classed as a private corporation'" and subject to suit) (quoting Victor Morawetz, *A Treatise on the Law of Private Corporations*, § 3 (2d ed. 1886)); *see also United States v. Deutsches Kalisyndikat Gesellschaft*, 31 F.2d 199, 202 (S.D.N.Y. 1929).

The overlay of a second sovereign highlights and exacerbates these problems. When the Nation chose to create CND it chose to do so according to the terms another sovereign prescribed. And as a creature of Oklahoma law, CND has no authority to commandeer that State's legislative processes and rewrite the statutory terms and conditions of its formation — any more than the State of Oklahoma may rewrite the laws of the Cherokee Nation. To allow CND the relief it seeks, to permit it to revise Oklahoma's statutory code to suit its preferences, would, clearly viewed, represent an infringement on the rights of only one sovereign — Oklahoma. *See Amtorg Trading Corp.*, 71 F.2d at 527; *Fed. Sugar Refining Co.*, 268 F. at 584-7 (rejecting claim of sovereign immunity by the federal government for a corporation it owned but was created under Delaware law because "[n]either the [federal] Executive nor any person acting with

-7-

authority under him had the power to change the Delaware [incorporation] statute, and hence no power to change the obligations, rights, or liabilities of a corporation which was the creature . . . of the sovereign state of Delaware").[1]

Not only is CND's claim to immunity inconsistent with the principles of sovereign immunity and corporate law and the rationales undergirding them, it is inconsistent as well with the more particular reasons the Supreme Court has given for recognizing tribal sovereign immunity. Tribal sovereign immunity seeks "to promote the goal[s] of Indian self-government, . . . tribal self-sufficiency, [and] economic development." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 510 (1991) (internal quotation marks omitted). And if respect for tribal self-determination and self-sufficiency means anything, it must mean respecting and giving effect to a tribe's free choices. In this case, the Nation made a free choice to incorporate a business under Oklahoma's law, and

---

[1] To be sure, courts sometimes pierce the corporate veil and disregard the corporate form. But we do so to prevent the corporation's owners from abusing the legal privilege of the corporate form when they seek to use that privilege to perpetrate a fraud or injustice. *See First Nat'l City Bank v. Banco Para El Comercio*, 462 U.S. 611, 621-22 (1983). We do *not* pierce the veil to allow a corporation to escape the legal obligations it assumed when incorporating.

In fact, the parties can point us to only one recorded case in which a court has found that an entity incorporated under the law of a second sovereign was entitled to tribal immunity — *Ransom v. St. Regis Mohawk Educ. & Comm. Fund, Inc.*, 658 N.E.2d 989 (N.Y. 1995). But the decision contains no reasoning that might persuade us to follow its solitary path in the face of a longstanding wall of contrary precedent.

respect for its sovereignty and autonomy should lead us to give effect to that choice.

Neither can we doubt that the Nation lacked for choices when it came to organizing CND — or that good reasons exist for the choice it made. The Nation could have chosen to operate the chiropractic clinic itself and enjoy immunity for its operations. *See Kiowa Tribe*, 523 U.S. 751. But this choice would have come at the cost of potentially limited growth because not all prospective business partners will agree to collaborate on such uneven terms. *See Dixon v. Picopa Constr. Co.*, 772 P.2d 1104, 1112 (Ariz. 1989) (observing that "[n]on-Indians will undoubtedly think long and hard before entering into business relationships with Indian corporations that are immune from suit"). Alternatively, the Nation could have chosen (as it did choose) to incorporate CND under state law, a choice that provided the Nation with lesser (though still significant) protection of tribal assets (the same protections any shareholder enjoys in a corporate setting), all while assuring potential business partners of the chance to do business on more even terms. That assurance carried with it the rationally attractive upside for the Nation of allowing CND a potentially greater range of business partners and creditors — and, with that, a greater chance for economic growth. *See Atkinson v. Haldane*, 569 P.2d 151, 174 (Alaska 1977); Frank Pommersheim & Terry Pechota, *Tribal Immunity, Tribal Courts, and the Federal System: Emerging Contours and Frontiers*, 31 S.D. L. Rev. 553, 559-60 (1986) ("For Indian tribes,

-9-

sovereign immunity is a double-edged sword. It is a necessary and appropriate principle with which to protect and guard irreplaceable tribal resources . . . [such as] land, timber, and minerals . . . . Nevertheless, a blind adherence to the concept of sovereign immunity would retard commercial and economic development."); Thomas P. McLish, *Tribal Sovereign Immunity: Searching for Sensible Limits*, 88 Colum. L. Rev. 173, 190 (1988).

Finally, nothing in the "subordinate economic entity analysis" discussed in *Breakthrough Management Group*, 629 F.3d 1173 (10th Cir. 2010), alters this analysis. That's because the subordinate economic entity test exists only to determine whether particular tribal subdivisions are or aren't "legal entit[ies] separate and distinct from the TRIBE." *White Mountain Apache Indian Tribe v. Shelley*, 480 P.2d 654, 655 (Ariz. 1971) (capitalization in original). So, for example, *BMG* itself involved the question whether a tribe's immunity extended to an unincorporated business owned by the tribe or to a tribal authority created under tribal law. And often the relationship between a tribe and various informal entities can be ambiguous. But this court has never applied the subordinate economic entity test to entities incorporated under the laws of a second sovereign. And for good reason. There's no need to. We can easily tell whether an entity like that is legally "separate and distinct from the tribe" by looking to the laws of the second sovereign. That's what we do when the federal government incorporates under state law. That's what we do when a foreign sovereign

-10-

incorporates under state law.  And that's what we do here.  Looking to Oklahoma

law, the answer is as apparent as it is unavoidable — telling us in clear terms that

CND, LLC is indeed a "separate legal entity" from its tribal owner.  18 Okla.

Stat. Ann. § 2004(B)(1).[2]

---

[2]  Beyond *BMG*, the remaining authority CND cites is no more persuasive. *United States v. Logan*, 641 F.2d 860 (10th Cir. 1981), involved an exercise in statutory interpretation and said nothing about tribal immunity or the court's subject matter jurisdiction. *Native American Distributing v. Seneca–Cayuga Tobacco Co. (NAD)*, 546 F.3d 1288 (10th Cir. 2008), involved a business run by a *tribe*, not a state corporation, and so stands only for the (undisputed) proposition post-*Kiowa* that a *tribe* engaged in business activities is immune from suit.